**RECEIVED**

JUN 20 2008
JUN 20 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.                                )
                                                                )
PATRICK TURNER, PRISON NO.#R-03191                              )
(Full name and prison number)                                   )
(Include name under which convicted)                            )
                                                                )
PETITIONER                                                      )
                                                                          08CV3551
                                                                          JUDGE ZAGEL
    vs.                                                         )         MAG. JUDGE BROWN
                                                                )
AUSTIN S. RANDOLPH, JR.                                         )
(Warden, Superintendent, or authorized                         )
person having custody of petitioner)                            )
                                                                )
RESPONDENT, and                                                 )
                                                                )
**(Fill in the following blank only if judgment**              )
**attacked imposes a sentence to commence**                     )
**in the future)**                                              )
                                                                )
ATTORNEY GENERAL OF THE STATE OF                                )          Case Number of State Court Conviction:
                                                                )
_____                                 )          99-CR-1204
(State where judgment entered)                                  )

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: CIRCUIT COURT OF COOK COUNTY, CRIMINAL

DIVISION, 2600 S. CALIFORNIA AVENUE.

2.  Date of judgment of conviction: SEPTEMBER 6, 2000

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

FIRST DEGREE MURDER: 720 ILCS 5/9-1.

4.  Sentence(s) imposed: TWENTY-FIVE IMPRISONMENT IN ILLINOIS DEPARTMENT OF CORRECTIONS.

5.  What was your plea? (Check one)        (A) Not guilty      ( X )
                                           (B) Guilty          (   )
                                           (C) Nolo contendere (   )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

N/A

Revised: 7/20/05

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial:  (Check one):     Jury ( x )          Judge only (  )

2. Did you testify at trial?        YES ( x )          NO      (  )

3. Did you appeal from the conviction or the sentence imposed?  YES ( x )  NO (  )

   (A)  If you appealed, give the

      (1)   Name of court:    FIRST DISTRICT APPELLATE COURT OF ILLINOIS.

      (2)   Result:           APPELLATE DEFENDER OFFICE FILED AN ANDERS BRIEF.

      (3)   Date of ruling:   MARCH 20, 2002.

      (4)   Issues raised:    APPELLATE DEFENDER OFFICE FILED AN ANDERS BRIEF.


   (B)  If you did not appeal, explain briefly why not:

   WHEN THE OFFICE OF THE STATE APPELLATE DEFENDER FILED AN ANDERS BRIEF, I HAD NO IDEAL
   I COULD FILE FOR LEAVE TO APPEAL TO THE ILLINOIS SUPREME COURT.

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (  )        NO (x)

   (A)  If yes, give the

      (1)   Result:

      (2)   Date of ruling:

      (3)   Issues raised:


   (B)  If no, why not:    AFTER AN ANDERS BRIEF WAS FILED, I DID NOT KNOW I COULD GO TO
                           THE ILLINOIS SUPREME COURT.

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( x )  No (  )

   If yes, give (A) date of petition: 02/24/05     (B) date *certiorari* was denied:    04/25/05

Revised: 7/20/05

## PART II – COLLATERAL PROCEEDINGS

I.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)   NO ( )

With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A. Name of court:  CIRCUIT COURT OF COOK COUNTY, ILLINOIS, CRIMINAL DIVISION

B. Date of filing:  DECEMBER 10, 2002.

C. Issues raised:  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND INEFFECTIVE ASSIATANCE OF APPELLATE COUNSEL.

D. Did you receive an evidentiary hearing on your petition?     YES ( )   NO (X)

E. What was the court's ruling?   THE COURT DENIED MY PETITION.

F. Date of court's ruling:   DECEMBER 16, 2002

G. Did you appeal from the ruling on your petition?     YES (X)   NO ( )

H. (a)   If yes, (1) what was the result?   APPELLATE COURT AFFIRMED THE CIRCUIT COURT'S DENIAL.

(2) date of decision:   JUNE 30, 2004.

(b)   If no, explain briefly why not: _____

I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (X)    NO ( )

(a)   If yes, (1) what was the result?  I WAS DENIED LEAVE TO APPEAL.

(2) date of decision:   NOVEMBER 24, 2004

(b)   If no, explain briefly why not: _____

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )        NO (X)

   A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

      1.    Nature of proceeding        N/A

      2.    Date petition filed        N/A

      3.    Ruling on the petition        N/A

      4.    Date of ruling        N/A

      5.    If you appealed, what was the ruling on appeal?        N/A

      6.    Date of ruling on appeal        N/A

      7.    If there was a further appeal, what was the ruling ?        N/A

      8.    Date of ruling on appeal        N/A

3.   With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (X)

   A. If yes, give name of court, case title and case number:

                     N/A

   B. Did the court rule on your petition? If so, state

    (1)  Ruling:        N/A

    (2)  Date:        N/A

4.   With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO (X)

   If yes, explain:        N/A

Revised: 7/20/05

## PART III -- PETITIONER'S CLAIMS

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you f set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST Y( STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one  PETITIONER ALLEGES HE RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, WHICH <u>VIOLATED HIS U.S. SIXTH AMENDMENT CONSTITUTIONAL RIGHTS.</u>
Supporting facts (tell your story <u>briefly</u> without citing cases or law):

PETITIONER'S TRIAL ATTORNEY FAILED TO CHALLENGE THE (PEOPLE'S) THEORY THAT THE WEAPON AT THE SCENE OF THE CRIME WERE ONLY OF DEFENDANT. THE TRIAL ATTORNEY FAILED TO OBJECT TO SAID PERJURY DURING TRIAL, AND FAILED TO PRESERVE THE PERJURY ISSUE IN A POST-CONVICTION MOTION. IF NOT FOR THE RESULT OF NEGLIGENCE OF TRIAL ATTORNEY, PETITIONER COULD HAVE BEEN FOUND GUILTY OF A LESSOR CHARGE OF SELF-DEFENSE OR SECOND DEGREE MURDER. ALSO, THESE ISSUES COULD HAVE BEEN RAISED IN HIS DIRECT APPEAL. THE TRIAL ATTORNEY DID NOT JUST FAIL TO CHALLENGE THE CRIME SCENE EVIDENCE, BUT FAILED TO ARGUE IT IN THE PETITIONER'S DEFENSE TO SUPPORT HIS CLAIM OF SELF-DEFENSE. BY NOT OBJECTING TO THE PERJURY ISSUE, THE PETITIONER'S TRIAL COUNSEL, ALLOWED THE PERJURED TESTIMONY OF DEMITRIA KEYES, TO BE PRESENTED TO THE JURY TO HAVE, WHILE THEY WERE DELIBERATING.

(B) Ground two <u>PETITIONER ALLEGES HE WAS DENIED FAIR ASSISTANCE FROM HIS APPELLATE COUNSEL.</u>
Supporting facts:

PETITIONER FILED A TIMELY NOTICE OF APPEAL AFTER HIS SENTENCING. THE APPELLATE DEFENDER FOR THE OFFICE OF THE STATE APPELLATE DEFENDER, FILED AN **ANDERS BRIEF**. IN THE ANDERS BRIEF, THE APPELLATE COUNSEL MADE AN ARGUMENT STATING, "THAT THE EVIDENCE AT TRIAL WAS SUFFICIENT TO ESTABLISH THE DEFENDANT'S GUILT OF FIRST DEGREE MURDER". THE PETITIONER ADMITTED SHOOTING THE VICTIM, BUT ONLY IN SELF-DEFENSE ! THE APPELLATE ATTORNEY DID NOT ASSIST THE PETITIONER IN A REASONABLE MANNER. IF SO, THE ATTORNEY WOULD HAVE ARGUED THAT THE STATEMENT MADE BY DEMITRIA KEYES, CONTRADICTED ONE-ANOTHER AND HOW THE CIRCUIT COURT JUDGE, VIOLATED THE PETITIONER'S RIGHT TO PRESENT A WITNESS IN HIS DEFENSE, AND TO CHALLENGE THE CREDIBILITY OF THE STATE'S WITNESS. THE PETITIONER'S APPELLATE ATTORNEY PERFORMANCE FALLS BELOW THE OBJECTIVE STANDARD OF REASONABLE REPRESENTATION AND THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME OF THE PROCEEDINGS WOULD HAVE BEEN DIFFERENT, IF NOT FOR THE ATTORNEY'S INADEQUATE PERFORMANCE. THE JURY MAY NOT HAVE FOUND HIM GUILTY OF FIRST DEGREE MURDER, BUT SELF-DEFENSE OR SECOND DEGREE MURDER. THE DISCRETION OF THE TRIAL JUDGE AND THE PERJURY OF THE WITNESS IS MERITORIOUS ISSUES THAT THE APPELLATE ATTORNEY COULD HAVE RAISED THE ISSUE OF THE INSUFFICIENT EVIDENCE, ALSO WERE ARGUABLE, WAS THAT THE TRIAL COUNSEL'S FAILURE TO CHALLENGE THE STATE'S POSITION THAT THERE WERE ABSOLUTELY NO EVIDENCE THAT THERE WAS NOT WEAPON, BESIDE THAT OF DEFENDANT'S AND THA THE TRIAL ATTORNEY WERE INEFFECTIVE.

THE PETITIONER'S RIGHTS WERE VIOLATED WHEN THE TRIAL COURT ALLOWED
(C) Ground three __A PERJURED WITNESS TESTIMONY TO STAND.__
Supporting facts:

AT THE PETITIONER'S TRIAL A STATE WITNESS, (DEMITRIA KEYES), WHO TESTIFIED THAT
"SHE" SAW THE SHOOTING FROM HER PORCH, HOWEVER, ON THE NIGHT OF THE INCIDENT, MS. KEYES
TOLD THE POLICE DETECTIVE, THAT SHE WAS ACTUALLY INSIDE HER HOUSE AT THE TIME OF THE
SHOOTING, THEREFORE, SHE COULD HAVE NOT SEEN THE SHOOTING AS DESCRIBED AT THE TRIAL.
DEMITRIA KEYES, ALSO TESTIFIED THAT, "SHE SAW THE PETITIONER STAND OVER THE VICTIM AND
SHOOT HIM SIX OR SEVEN TIMES, WHILE THE VICTIM LAY ON THE GROUND.  THE STATE'S WITNESS
DETECTIVE DAVID GOLUBIAK, TESTIFIED THAT KEYES WAS INTERVIEWED BY HIM, AND SHE TOLD HIM,
THAT WHEN SHE HEARD SHOTS, SHE TOOK COVER IN THE HOUSE AND THAT EVERYONE WAS IN THE
HOUSE, AT THE TIME OF THE SHOOTING.  MS. KEYES, MADE A DIFFERENT STATEMENT FROM THE NIGHT
OF THE INCIDENT, AS TO WHAT SHE SAID AT TRIAL.  AT THE TRIAL, THE PETITIONER'S DEFENSE
WERE THAT HE HAD NO INTENTION TO COMMIT MURDER, AND THAT HE ACTED IN SELF-DEFENSE.  THE
TESTIMONY OF KEYES WAS INCRIMINATING.   WHICH MAY HAVE RESULTED IN A FATAL JUDGMENT BY
THE JURY.  **(CONT. ON PAGE 6a)**
   (D) Ground four __THE PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO__
     Supporting facts:  (PRESENT A WITNESS IN HIS BEHALF/DEFENSE.

THE PETITIONER WAS DENIED HIS RIGHT TO PRESENT (NICOLE WALLS), TO TESTIFY IN HIS BEHALF.

PETITIONER WAS NOT PERMITTED TO DEMONSTRATE THAT (KEYES) PERJURED HERSELF, BECAUSE HE
WAS BARRED FROM INTRODUCING THE TESTIMONY OF (NICOLE WALLS).  MS. WALLS, COULD HAVE
DISCREDITED WITNESS (KEYES) CLAIM THAT SHE WAS ON HER PORCH AT THE TIME OF THE SHOOTING.
BY (KEYES) BEING THE STATE'S WITNESS, AND (NICOLE WALLS), NOT BEING ABLE TO INTRODUCE
TO THE COURT A LIABLE TESTIMONY TO PROVE (KEYES) PERJURED HERSELF.  (NICOLE WALLS),
TESTIMONY MAY HAVE CHARGED THE DECISION OF THE JURY, IF SHE COULD HAVE BEEN ALLOWED TO
TESTIFY IN BEHALF OF THE DEFENSE.  THE TRIAL JUDGE ABUSED HIS DISCRETION BY REFUSING
THE PETITIONER HIS RIGHTS.  THE PETITIONER HAVE THE RIGHT TO HAVE COMPULSORY PROCESS
FOR OBTAINING WITNESSES IN HIS FAVOR.

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

     YES (x)  NO ( )

3.  If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

Revised: 7/20/05

CONTINUATION OF GROUND THREE (C):  (DEMITRIA KEYES), WAS THE PEOPLE'S
MAIN WITNESS.  THE PEOPLE/STATE KNOWINGLY USED PERJURED TESTIMONY,
WHICH THE TRIAL JUDGE ALLOWED THE TESTIMONY TO BE PRESENTED TO THE
JURY TO DELIBERATE WITH.  EVEN ON APPEAL, THE STATE DOES NOT APPEAR
TO DISPUTE THAT "THE KNOWING USE OF PERJURED TESTIMONY TO OBTAIN A
CRIMINAL CONVICTION CONSTITUTES A VIOLATION OF DUE PROCESS".

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing ___ DAYNA WOODBURY ___

(B) At arraignment and plea ___ DAYNA WOODBURY ___

(C) At trial ___ DAYNA WOODBURY ___

(D) At sentencing ___ DAYNA WOODBURY ___

(E) On appeal ___ THOMAS F. FINEGAN ___

(F) In any post-conviction proceeding ___ PRO-SE. ___

(G) Other (state): ___ ON POST-CONVICTION APPEAL: STEVEN W. BECKER, 203 N. LASALLE ST.
ON POST-CONVICTION LEAVE TO APPEAL, PRO-SE.                              CHGO. IL
ON WRIT OF CERTIORARI, PRO-SE.

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( **x** )

Name and location of the court which imposed the sentence: ___ **N/A** ___

Date and length of sentence to be served in the future ___ **N/A** ___

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: ___

(Date)

___
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

___
(Signature of petitioner)

___ #R-03191 – IL RIVER CORR. CENTER
(I.D. Number)

___ P.O. BOX 1900, CANTON, IL  61520
(Address)

7

Revised: 7/20/05

**ORIGINAL**

# 98997

NO. _____

## IN THE SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| People State of Illinois, | ) | Appellate Court, |
| | ) | First District |
| Respondent | ) | No.    1-03-0236 |
| | ) | |
| v. | ) | Circuit Court, |
| | ) | Cook County |
| Patrick Turner, | ) | No.    99 CR 12040 |
| | ) | |
| Petitioner | ) | Hon. James B. Linn, |
| | ) | Judge Presiding. |

### PETITION FOR LEAVE TO APPEAL

**FILED**

AUG 2 0 2004

**SUPREME COURT CLERK**

70-090804
R - 003004
No RH

Patrick Turner
Reg. No. R-03191
P. O. Box 711
Menard, Illinois  62259

IN THE SUPREME COURT OF THE STATE
OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | PETITION FOR LEAVE TO APPEAL FROM THE APPELLATE COURT OF ILLINOIS, FIRST DISTRICT |
| Respondent | No. 99-CR-12040 |
| VS. | THERE HEARD ON APPEAL FROM THE CIRCUIT COURT FOR THE FIRST JUDICIAL CIRCUIT, COOK COUNTY, ILLINOIS |
| PATRICK TURNER - R03141, | THE HONORABLE |
| Petitioner. | JUDGE PRESIDING. |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICE OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May it Please the Court!

### I
### PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Patrick Turner, pro se, respectfully petitions this Honorable Court for Leave to Appeal pursuant to Supreme Court Rule 315, from the judgment of the Appellate Court of Illinois, First District, which affirmed the judgment of conviction entered by the Circuit Court of Cook County, Illinois upon the jury finding petitioner guilty of First Degree Murder.

1.

_OPINION AND PROCEEDING BELOW_

On January 26,2001, Petitioner was found guilty of First-Degree Murder. Petitioner was subsequently sentenced to a 25 years' prison term upon his conviction. He appealed This conviction from the post-conviction Denial by the circuit court, to The Illinois Appellate Court First District. On June 30, 2004, the Appellate Court delivered it's opinion in said appeal, affirming The judgment of conviction and sentence. No petition for rehearing was filed.

2.

III

## POINTS RELIED UPON FOR REVERSAL

THE CIRCUIT COURTS SUMMARY DISMISSAL ORDER ADDRESSED ONLY 'ONE' OF THE CLAIMS IN TURNER POST-CONVICTION PETITION IN VIOLATION OF THE ILLINOIS SUPREME COURT'S HOLDING, IN RIVERA, WHETHER THE DISMISSAL ORDER MUST BE VACATED AND THE ENTIRE CAUSE REMANDED FOR SECOND STAGE PROCEEDINGS.

TURNER RAISES THE GIST OF A CONSTITUTIONAL CLAIM THAT DEMITRIA KEYES PERJURED HERSELF.

TURNER RAISES THE GIST OF A CONSTITUTIONAL CLAIM THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

IV

## STATEMENT OF FACTS

Patrick Turner was convicted by a jury of First-Degree murder in the September 1998 shooting of Jaha-Jackson and was sentence to 25 years' imprisonment.

At trial, Turner testified that the shooting occurred as an act of self-defense. Demitria Keyes, one of the State's main witnesses told the Jury that she was sitting on her porch directly across the street from where the incident happened when she heard a gunshot. She claimed that Turner shot at Jackson approximately six or seven times while Jackson layed on the ground. She futher told the Jury that, although the gun jammed two or three times, Turner unjammed the gun so that he could continue to shoot at Jackson.

Detective David Golubiak, however, testified That when he interviewed Keyes on the night of the shooting, she told him that when she heard shots she took cover in the house and that everyone was in the house at the time of the shooting. Furthermore, Detective Golubiak stated that in the two-year period between the date of the incident and the time of trial, Keyes never contacted him to tell him that she was now a witness to the shooting.

In addition, at trial, Turner sought to have Nicole Walls testify that at the time of the incident Keyes was not on her porch as she claimed but was instead, coming home from the store. The defense did not learn of the witness until the day Turner was to put on his defense case at trial. Although the trial court stated that Ms. Walls testimony would impeach Keyes testimony and "make her basically a liar," the Court refused to allow the defense to call Walls.

4.

## V.

### ARGUMENT

THE CIRCUIT COURTS SUMMARY DISMISSAL ORDER ADDRESSED ONLY 'ONE' OF THE CLAIMS IN TURNER POST-CONVICTION PETITION IN VIOLATION OF THE ILLINOIS SUPREME COURTS HOLDING, IN *RIVERA*, WHETHER THE DISMISSAL ORDER MUST BE VACATED AND THE ENTIRE CAUSE REMANDED FOR SECOND STAGE PROCEEDINGS.

Turner raised multiple challenges to his conviction, which for sake of clarity, can be divided into two categories (1) ineffective assistance of trial counsel for failing to object to and preserve an issue pertaining to the State's knowing use of a perjured testimony of Demitria Keyes; and (2) ineffective assistance of appellate counsel for failing to assert meritorious issues on appeal and, instead, filing an *Anders* brief. The issues that appellate counsel failed to raise include *inter alia,* the trial court's refusal to allow the defense to call Nicole Walls as a rebuttal witness to impeach Demitria Keyes, instances of prosecutorial misconduct during closing argument, and the forementioned perjury issue.

In People v. Rivera, 198 Ill.2d 364, 763 N.E.2d 306 (2001), our Supreme Court held that Circuit Court lacks the power to summarily dismiss only portions of a post-conviction petition. Here, the circuit court did exactly that: it dismissed the perjury claim but never ruled on the remaining allegations. *Rivera* and its progeny require that the dismissal be vacated and that the entire cause be remanded for second stage proceedings.

In *Rivera*, the Supreme Court construed the Post-Conviction Hearing Act (Act) as placing another limit on a

circuit courts summary dismissal power. Therein, the Court held that the Act did not vest the trial court with the authority to summarily dismiss claims, instead, it could only dismiss entire petitions which failed to meet the statutory standard, i.e., they were either "frivolous or patently without merit." Rivera, 763 N.E.2d at 310. The Rivera court base its decision on the express language of the Act, which spoke solely to the review and dismissal of petitions, rather than claims. Id. The Court also noted that if partial dismissals were permissible, problems as to the appealability of those dismissals and the timing of such appeals would arise. Id. Accordingly, the court held that post-conviction filings must be addressed as a unit, and if any portion of that pleading survives stage-one dismissal, the entire pleading moves with it.

It shows in the circuit court opinion that Turner Post-Conviction clearly pass the first stage atleast, one or Turner argument were addressed and not consider as frivolous or patently withouT merit. According to the ruling in Rivera, This court should vacate the circuit court and appellate court ruling and Turner entire case be remanded for the second stage proceedings, due to the trial courts entire analysis was limited solely to the perjury claim, which was rejected, and Turner Post-Conviction relief was Denied.

Turner hope that this Court do not reject and base his argument accordingly to the Lee case. In People v. Lee No 1-01-1018, 2003 Ill App LEXIS 1376 (1st Dist. 1st Div. Nov 24,2003) reh'g petition filed (Dec. 15,2003) the court rejected the defendant's argument that the court's order had to be treated as a partial dismissal because the trial court gave no reason for dismissing one of the claims. In the Lee case all of the issues were considered and rejected.

The Circuit Court made it difficult for Turner to appeal his other issues, due to the fact that he were not given a reason why his other issue were dismiss

Pursuant to Rivera, the appropriate relief for this error is to vacate the dismissal order and remand the entire cause to the trial court with directions to advance the matter to stage two and for the appointment of counsel. Indeed, cases construing Rivera have so required, regardless of the viability of either the partially dismissed or undismissed claims. For example, in People v. Montgomery 327 Ill. App. 3d 180, 763 N.E.2d 369, 376-77 (1st Dist. 2001), this Court stated that although it was "prepared" to address the claims individually on appeal, Rivera "will essentially require second stage post-conviction review of the entire petition and appointment of counsel, if petitioner is so entitled, whenever any allegation of a multiple-claim, first stage post-conviction petition is not found to be frivolous or patently without merit." Montgomery, 763 N.E.2d at 376-77 (emphasis in original). The Second District recently reached the same conclusion in People v. Armstrong, 329 Ill. App. 3d 150, 769 N.E.2d 77, 77-79 (2nd Dist 2002). See also People v. Etherly. No. 1-01-9166, 2003 Ill. App. LEXIS 1372, at *42-153 (1st Dist, 6th Div, Nov. 21, 2003) ("The Act does not allow partial dismissals; therefore, if any one allegation states a constitutional deprivation that is substantively unrebutted by the record, the entire petition is to be docketed for futher consideration in accordance with sections 122-4 through 122-6.")

Therefore, Turner had no choice other than to timely appeal from the trial courts ruling denying his post-conviction petition in order to preserve his appellate rights. See Id. Whether the trial court properly disposed of Turners' petition is an entirely separate question and in no way implies that turner, by asserting his legal right to an

8.

Appeal, in some manner "construed the trial court's order as a summary dismissal of the entire petition." In sum, the State's argument were belied by the central holding of <u>Rivera</u> that, in explicitly rejecting partial summary dismissals, implicitly rejected the propriety of piecemeal appeals from such dismissals. See <u>Rivera</u>, 763 N.E.2d at 310-11.

Accordingly, because the circuit court never addressed or dismissed the numerous claims of ineffective assistance of appellate counsel raised in Turner's petition, the dismissal order must be vacated and the cause remanded to the trial court for the appointment of counsel and for second-stage proceedings. See <u>People v. Montgomery</u>, 327 Ill. App. 3d 180, 763 N.E.2d 369, 377 (1st Dist 2001) (remanding for second-stage proceedings).

TURNER RAISES THE GIST OF A CONSTITUTIONAL CLAIM THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

The next determination to be made by the trial court is whether the constitutional deprivation is substantively rebutted by the record, rendering the petition frivolous and patently without merit. Id at *5).

It is well established that the State's knowing use of perjured testimony in obtaining a criminal conviction raises a constitutional due process violation. See, e.g., <u>People v. Brown</u>, 169 Ill.2d 94, 660 N.E.2d 964, 968 (1995); <u>People v. Cihlar</u>, 125 Ill. App. 3d 204, 465 N.E.2d 625, 628 (1st Dist. 1984) (ruling that petitioner stated a substantial constitutional claim based on perjury and remanding

4.

for evidentiary hearing). aff'd III Ill.2d 212, 489 N.E.2d 859, 861 (1986); see also U.S. Const. amends. V, XIV; Ill. Const. art. I, § 2.

The State does not appear to dispute in this appeal that "the knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process." People v. Jimerson, 166 Ill.2d 211, 652 N.E.2d 278, 282 (1995). Likewise, the State never contests that Turner has stated the "gist of a constitutional claim" in his post-conviction petition See people v. Edwards. 197 Ill.2d 239, 757 N.E.2d 442, 445 (2001). In fact, the State makes reference to the "gist" standard on only one occasion in its eight pages of argument concerning the present issue. This cursory reference to the "gist" standard occurs in the following passage: "Petitioners position that he has demonstrated a "gist" of a meritorious claim and that his petition should proceed to stage two to enable further investigation places the cart before the horse. The correct analysis requires the dismissal of the claim for the reason that petitioner has pleaded himself out of court."

Accordingly, because Turner petition stated the "gist" "of a constitutional claim," the trial courts dismissal of his petition should be reversed and the matter remanded for second-stage proceedings.

TURNER RAISES THE GIST OF A CONSTITUTIONAL CLAIM THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

In Turner Post-Conviction Petition he alleged that he received ineffective assistance of appellate counsel, where counsel filed an Anders brief in a First Degree Murder case

10.

addressing only the sufficiency of the evidence and failed to raise several meritorious issues, including the trial courts refusal to allow the defense to call Nicole Walls as a rebuttal witness to impeach Demitria Keyes, instances of prosecutorial misconduct during closing arguments, and the aforementioned perjury issue.

"Few rights are more fundamental than of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct 1038, 35 L.Ed. 2d 297 (1973). See U.S. Const. amends. V, VI, XIV; Ill. Const. art. I §§ 2, 8. Accordingly, the reasons for restricting the use of the exclusion sanctions are most compelling in the case of criminal defendants, where due process requires that a defendant be permitted to offer testimony of witnesses in his defense. *People v. Rayford*, 43 Ill. App. 3d 283, 356 N.E. 2d 1274, 1277 (5th Dist 1976). In addition, a defendant has the right to confront the prosecutions evidence. See *People v. Smith*, 38 Ill 2d 13, 230 N.E. 2d 188, 190 (1967); U.S. Const. amends VI, XIV; Ill. Const. art. I §8.

In *Edwards*, the Illinois Supreme Court made clear that a pro se, petitioner's petition must be liberally construed, "need only present a limit amount of detail," and, "hence I, J need not set forth the claim in its entirety." *Edwards*, 757 N.E. 2d at 445. It is undisputed that Turner's petition explicitly cited to the prosecutions "improper closing arguments" as a deprivation of his constitutional rights, listed a number of specific instances of such improper remarks, and asserted that appellate counsel was ineffective for failing to assert these errors on direct appeal. The fact that Turner a *pro se*, petitioner, was unable to identify additional legally inappropriate remarks in no way waives the consideration of those improper comments on appeal.

The additional remarks fall within the general category of prosecutorial misconduct raised by Turner and, as noted by the Court in *Edwards*, Turner need not detail his claim "in its entirety." See *Edwards*, 757 N.E.2d at 445. Therefore, this court may consider the claims.

Accordingly, because the circuit court never addressed or dismissed the numerous claims of ineffective assistance of appellate counsel in the petition, the dismissal order must be vacated and the cause remanded to the trial court for the appointment of counsel and for second-stage proceedings. *Montgomery*, 763 N.E.2d at 377 (remanding for second-stage proceedings).

Further, reversal is also compelled because the time limit for summary dismissal of 90 days has long since passed. 725 ILCS 5/122-2.1(a)(west 2002). This Supreme Court has held that the time limit is mandatory, not directory, and that a summary dismissal entered after the expiration of the statutory time limit is void. *People v. Porter*, 122 Ill. 2d 64, 521 N.E.2d 1158, 1161 (1988). Significantly, once such time period has expired, the circuit court loses all power to summarily dismiss a petition:

> If more than 30 days [now 90 days] have elapsed since the petition was filed, the court has no authority to enter a judgment of summary dismissal. Thus, a judgment of summary dismissal entered after the [90]-day period has expired is void. The petition must be treated as if the court found it was not frivolous or patently without merit.

*People v. Turner*, 249 Ill. App. 3d 297, 619 N.E.2d 860 (2d Dist. 1993)(citations omitted)(emphasis added). Accord *People v. Redmond*, 328 Ill. App. 3d 373, 767 N.E.2d 838, 841 (2d Dist. 2002). In other words, if a claim is not dismissed within the 90 day window, it is deemed to state "the gist of a constitutional claim" by

12.

operation of law, and the petition must be advanced to the next stage of the proceedings.

Because the circuit court did not address the grounds upon which Turner claimed ineffective assistance of appellate counsel within the 90-day time period, under *Petter* that Power has now lapsed. Second-stage proceedings including appointment of counsel, are therefore mandated by the Act.

## CONCLUSION

For the foregoing reasons, Patrick Turner, Petitioner, respectfully request that this Court reverse the Circuit Court and Appellate court dismissal of his Post-Conviction Petition and Post-Conviction Appeal order and remand the case to the Circuit Court for further proceeding in accordance with Sections 122-4 through 122-6 of the Act.

Respectfully Submitted

Patrick Turner
pro se,

Patrick Turner
Reg. No R-03191
Menard Corr. Center
P.O. Box 711
Menard, IL, 62259

Date: August 1, 2004

13.

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday,
the eighth day of November, 2004.

Present: Mary Ann G. McMorrow, Chief Justice
Justice Charles E. Freeman          Justice Thomas R. Fitzgerald
Justice Robert R. Thomas            Justice Thomas L. Kilbride
Justice Rita B. Garman              Justice Philip J. Rarick

---

On the twenty-fourth day of November, 2004, the Supreme Court entered the
following judgment:

No. 98997

People State of Illinois,                          Petition for Leave
                                                    to Appeal from
        Respondent                                  Appellate Court
                                                    First District
        v.                                          1-03-0236
                                                    99CR12040
Patrick Turner,

        Petitioner


The Court having considered the Petition for leave to appeal and being fully
advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order entered in this case.

                        IN WITNESS WHEREOF, I have hereunto
                        subscribed my name and affixed the Seal
                        of said Court, this sixteenth day
                        of December, 2004.

                        *Juleann Hornyak*

                                              Clerk,
                        Supreme Court of the State of Illinois

No. _____

_____

IN THE

SUPREME COURT OF THE UNITED STATES

_____

_Patrick Turner_ — PETITIONER
(Your Name)

VS.

_Alan Uchtman_ — RESPONDENT(S)

MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

The petitioner asks leave to file the attached petition for a writ of certiorari without prepayment of costs and to proceed *in forma pauperis*.

[ ] Petitioner has previously been granted leave to proceed *in forma pauperis* in the following court(s):

_Cook County Circuit Court 1st Dist. Appellate_
_Court and Cook county circuit court, Post conviction_

[ ] Petitioner has **not** previously been granted leave to proceed *in forma pauperis* in any other court.

Petitioner's affidavit or declaration in support of this motion is attached hereto.

_Patrick Turner_
(Signature)

## AFFIDAVIT OR DECLARATION
## IN SUPPORT OF MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

I, _Patrick Turner_, am the petitioner in the above-entitled case.  In support of my motion to proceed *in forma pauperis,* I state that because of my poverty I am unable to pay the costs of this case or to give security therefor; and I believe I am entitled to redress.

1. For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months.  Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.  Use gross amounts, that is, amounts before any deductions for taxes or otherwise.

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ 0 | $ 0 | $ 0 | $ 0 |
| Self-employment | $ 0 | $ 0 | $ 0 | $ 0 |
| Income from real property (such as rental income) | $ 0 | $ 0 | $ 0 | $ 0 |
| Interest and dividends | $ 0 | $ 0 | $ 0 | $ 0 |
| Gifts | $ 0 | $ 0 | $ 0 | $ 0 |
| Alimony | $ 0 | $ 0 | $ 0 | $ 0 |
| Child Support | $ 0 | $ 0 | $ 0 | $ 0 |
| Retirement (such as social security, pensions, annuities, insurance) | $ 0 | $ 0 | $ 0 | $ 0 |
| Disability (such as social security, insurance payments) | $ 0 | $ 0 | $ 0 | $ 0 |
| Unemployment payments | $ 0 | $ 0 | $ 0 | $ 0 |
| Public-assistance (such as welfare) | $ 0 | $ 0 | $ 0 | $ 0 |
| Other (specify): _____ | $ 0 | $ 0 | $ 0 | $ 0 |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2. List your employment history for the past two years, most recent first.   (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|---|---|---|---|
| N/A | N/A | N/A | $ N/A |
| " " | " " | " " | $ " " |
| N/A | N/A | N/A | $ N/A |

3. List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|---|---|---|---|
| N/A | N/A | N/A | $ N/A |
| " " | " " | " " | $ " " |
| N/A | N/A | N/A | $ N/A |

4. How much cash do you and your spouse have? $_____
   Below, state any money you or your spouse have in bank accounts or in any other financial institution.

| Financial institution | Type of account | Amount you have | Amount your spouse has |
|---|---|---|---|
| N/A | N/A | $ N/A | $ N/A |
| " " | " " | $ " " | $ " |
| N/A | N/A | $ N/A | $ N/A |

5. List the assets, and their values, which you own or your spouse owns.  Do not list clothing and ordinary household furnishings.

☐ Home
   Value   N/A

☐ Other real estate
   Value   N/A

☐ Motor Vehicle #1
   Year, make & model   N/A
   Value   N/A

☐ Motor Vehicle #2
   Year, make & model   N/A
   Value   N/A

☐ Other assets
   Description   N/A
   Value   N/A

6. State every person, business, or organization owing you or your spouse money, and the amount owed.

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| N/A | $ N/A | $ N/A |
| " " | $ " " | $ " " |
| N/A | $ N/A | $ N/A |

7. State the persons who rely on you or your spouse for support.

| Name | Relationship | Age |
|---|---|---|
| None | N/A | N/A |
| " " | " " | " " |
| None | N/A | N/A |

8. Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse.  Adjust any payments that are made weekly, biweekly, quarterly, or annually to show the monthly rate.

|  | You | Your spouse |
|---|---|---|
| Rent or home-mortgage payment (include lot rented for mobile home) Are real estate taxes included? ☐ Yes ☐ No  Is property insurance included? ☐ Yes ☐ No | $ 0 | $ 0 |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ 0 | $ 0 |
| Home maintenance (repairs and upkeep) | $ 0 | $ 0 |
| Food | $ 0 | $ 0 |
| Clothing | $ 0 | $ 0 |
| Laundry and dry-cleaning | $ 0 | $ 0 |
| Medical and dental expenses | $ 0 | $ 0 |

|                                                                                          | You       | Your spouse |
|------------------------------------------------------------------------------------------|-----------|-------------|
| Transportation (not including motor vehicle payments)                                    | $ 0       | $ 0         |
| Recreation, entertainment, newspapers, magazines, etc.                                   | $ 0       | $ 0         |

Insurance (not deducted from wages or included in mortgage payments)

|                          | You       | Your spouse |
|--------------------------|-----------|-------------|
| Homeowner's or renter's  | $ 0       | $ 0         |
| Life                     | $ 0       | $ 0         |
| Health                   | $ 0       | $ 0         |
| Motor Vehicle            | $ 0       | $ 0         |
| Other: _____ N/A _____   | $ 0       | $ 0         |

Taxes (not deducted from wages or included in mortgage payments)

|                          | You       | Your spouse |
|--------------------------|-----------|-------------|
| (specify): _____ N/A ____ | $ 0      | $ 0         |

Installment payments

|                          | You       | Your spouse |
|--------------------------|-----------|-------------|
| Motor Vehicle            | $ 0       | $ 0         |
| Credit card(s)           | $ 0       | $ 0         |
| Department store(s)      | $ 0       | $ 0         |
| Other: _____ N/A _____   | $ 0       | $ 0         |

|                                                                                          | You       | Your spouse |
|------------------------------------------------------------------------------------------|-----------|-------------|
| Alimony, maintenance, and support paid to others                                         | $ 0       | $ 0         |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ 0    | $ 0         |
| Other (specify): _____ N/A _____                                                         | $ 0       | $ 0         |
| **Total monthly expenses:**                                                              | $ 0       | $ 0         |

9. Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?

☐ Yes    ☒ No    If yes, describe on an attached sheet.

10. Have you paid – or will you be paying – an attorney any money for services in connection with this case, including the completion of this form?    ☐ Yes    ☒ No

If yes, how much? _____ N/A _____

If yes, state the attorney's name, address, and telephone number:

11. Have you paid—or will you be paying—anyone other than an attorney (such as a paralegal or a typist) any money for services in connection with this case, including the completion of this form?

☐ Yes    ☒ No

If yes, how much? _____ N/A _____

If yes, state the person's name, address, and telephone number:

12. Provide any other information that will help explain why you cannot pay the costs of this case.

I'm incarcerated, and have no employment

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____ , 20___

Patrick Turner
(Signature)

NO.

IN THE
SUPREME COURT OF THE UNITED STATES

_Patnick Turner_
PETITIONER

VS.

_Alan Uchtman_
RESPONDENT

PROOF OF SERVICE

I, _Patrick Turner_, do swear or declare that on this date, _Feb 10_, 200_5_, as required by Supreme Court Rule 29, I have served the enclosed MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS and PETITION FOR WRIT OF CERTIORARI on the below named parties or their counsel, and on every other person required to be served, by depositing said motions in the institutional mail at the Menard Correctional Center, Menard, IL 62259-0711, properly addressed with first-class postage prepaid.

TO: _Office of The Clerk_   TO: _____
_Supreme Court of the U.S_   _____
_Washington D.c 20543_   _____

TO: _Lisa Murray Madigan_   TO: _____
_100 W Randolph St 12th Fl_   _____
_Chi° IL 60601_   _____

I swear that the above statements are true and correct.

Subscribed and sworn to                  _Patrick Turner_
before me on this _10_                    PETITIONER
day of _February_, 200_5_.                IDOC# _R03191_
                                          Menard Correctional Center
_Timothy D. Sapp_                         PO Box 711
NOTARY PUBLIC                             Menard, IL 62269-0711

"OFFICIAL SEAL"
TIMOTHY D. SAPP
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6/19/2007

## QUESTION(S) PRESENTED

### I

Should a defendant be deprived of Liberty, because the Appellate Counsel(s) think they have a Right to file a **Anders** Brief?

### II

Should a defendant be denied his Constitutional Rights, because the trial Judge denied him or her the Right to challenge the credibility of the States' witnesses?

### III

Should a defendant be subjected to a waiver due to the ineffective assistance of trial and appellate counsels?

### IV

Is it Right for a defendant to have the Jury consider the testimony of a known perjured witness while the jury are deliberating?

I.

# LIST OF PARTIES

All parties appear in the Caption of the case on the cover page.

TABLE OF CONTENTS

PAGE

Questions PResented for Review                                        I

UList of Parties                                                     II

Table of Contents                                                  III

Table of Authories                                                  IV

Opinoions Below                                                      1

Statement of Jurisdiction                                            2

Constitutional Provision and Statutes Involved          3(a),3(b)

Stabement of the Case                                                4

Reasons for Granting the Writ                                        5

   The United States SUpreme Court should Grant this Petition because

   the Circuit Court violated Turners Constitutional right, and

   Turner received ineffective assistance by Trial and Appellate

   Counsel which ultimately led to Turner being convicted of First

   Degree Murder.                                                 5

Conclusion                                                          11


APPENDIX

   Appendix A-Illinois Supreme Court order                       A1

   Appendix B-Appellate Court of Illinois

     order                                                    B1

TABLE OF AUTHORTIES

## CASES

Anders v. California, 386 U.S. 738                                                   5,6,8

Smith v. Robbins, 528 U.S. 259, 145 L.Ed.2d 756, 120 S.Ct. 746                          5

Chambers v. Mississippi, 410 U.S. 284, 935 S.Ct. 1035, 35 L.Ed.2d 297                   6

In re Oliver 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed.2d 682 (1996)..             6

Morrissey v. Brewer, 408 U.S. 471, 488-489, 92 S.Ct. 2593, 2603-2604,

    33 L.Ed.2d 484 (1972)                                           7

Jenkins v. Mckeithen, 395 U.S. 411, 428-429, 89 S.Ct. 1843, 1852-1853,

    23 L.Ed.2d 404 (1969)                                            7

Specht v. Patterson 386 U.S. 605, 610, 87 S.Ct. 1209, 1212,

    18 L.Ed.2d 326 (1967)                                            7

Brown v. Illinois, 169 Ill. 2d 94, 660 N.E.2d 964, 968 (1995)                          8

Cihler v. Illinois, 125 Ill. App. 3d 204, 465 N.E. 2d 964 (1st Dist.

    1984)                                                            8

aff'd 111 Ill. 2d 212, 489 N.E. 2d 859, 861 (1996)                                      8

## CONSTITUTIONAL PROVISIONS

    United States Constitutional Amendment V                           5

    United States Constitutional Amendment VI                          5,6

    United States Constitutional Amendment XIV                         5,6,8,

    Illinois Constitution Article 1, Section 2                         5,8

## STATUTORY PROVISIONS.

    725 ILCS 5/115-10.1 (a-c)                                         6

IV

IN THE

SUPREME COURT OF THE UNITED STATES

PETITION FOR WRIT OF CERTIORARI


Petitioner respectfully prays that a writ of certiorari issue to review to the judgment below.


## OPINIONS BELOW

The opinion of the highest State Court to review the merits appears at Appendix <u>A</u> to the petition and is unpublished.

The opinion of the Illinois Appellate Court appears at Appendix <u>B</u> to the petition and is unpublished.


1.

## JURISDICTION

The date on which the highest State Court decided Turner case was November 24, 2004. A copy of that decision appears at Appendix <u>A</u>.


The jurisdiction of this Court is invoked under 28 U.S.C. § 1257 (a).

2.

## CONSTITUTIONAL PROVISIONS INVOLVED

**United States Constitution, Amendment V:**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the naval forces, or in the Militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property, without due process of law; nor shall property be taken for public use without just compensation.

**United States Constitution, Amendment VI:**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

**United States Constitution, Amendment XIV, Section 1:**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Illinois Constitution, Article I, Section 2:

Due process and Equal protection;

"No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws.

## STATUTORY PROVISION INVOLVED

725 ILCS 5/115-10.1 (a-c)

3(b).

## STATEMENT OF THE CASE

Patrick Turner was convicted by a jury of first degree murder in the September 1998 shooting of Jaha Jackson and was sentenced to 25 years' imprisonment.

On Turner direct appeal, the appellate counsel filed a motion to withdraw pursuant to **Anders v. california**. On March 20,2004, the court granted the **Anders** motion.

Turner than filed a pro se post-conviction petition which he asserted that (1) his trial counsel was ineffective for failing to object to and preserve an issue pertaining to the States' knowing use of the perjured testimony of Demitria Keyes; and (2) his appellate counsel was ineffective for failing to assert meritorious issues on appeal. On December 10,2002, the circuit court dismissed Turners' petition.

On December 26,2002, Turner filed a timely notice of appeal. Turner claim in his appeal that (1) the circuit courts summary dismissal order addressed only One of the claims in his post-convictions petition in which violated the Illinois Supreme Courts Holding in **Rivera**, (2) that his case must be remanded for second-stage proceeding where his petition raised the Gist of a Constitutional claim that Demitria Keyes perjured herself, and (3) he raised the Gist of a Constitutional claim that he received ineffective assistance of appellate counsel, On June 30,2004, the appellate court denied Turner appeal, Turner filed a timely Leave to Appeal, which were denied on November 24,2004.

REASONS FOR GRANTING THE PETITION

THE UNITED STATES SUPREME COURT SHOULD GRANT THIS PETITION BECAUSE THE
CIRCUIT COURT VIOLATED TURNER'S CONSTITUTIONAL RIGHT, AND TURNER
RECEIVED INEFFECTIVE ASSISTANCE BY TRIAL AND APPELLATE COUNSEL WHICH
LED TO TURNER BEING CONVICTED OF FIRST DEGREE MURDER.

Reason one for granting Turner Petition, according to Question one:

The Appellate Counsel of the Appellate Court of Illinois filed a <u>Anders</u>
brief, under <u>Anders v. California</u>, 386 U.S. 738 (1967), with support by <u>Smith
v. Robbins</u>, 528 U.S. 259, 145 L.Ed.2d 756, 120 S.Ct. 746.
The Appellate COunsel made an argument stating that the evidence at trial was
sufficient to establish the defendant's guilt of first degree murder beyond a
reasonable doubt.
At trial Turner admitted shooting the victim, however in the act of self-
defense. Turner did not appeal to prove his innocence of committing the crime.
Turner acknowledged the murder that occured, Turner appeals to the Appellate
Court because he did not receive a fair trial, which is promised to him,
according to his Fifth and Fourteenth Amendment of the United States Constit-
ution and the Illinois Constitution, Article 1, § 2.

The Appellate Counsel did not give Turner full assistance or reasonable
assistance, if so, the Appellate Counsel would have noticed the perjury of
Demitria Keyes testimony and violation of the Circuit Court Judge, by not
allowing the defense witness to present a statement which violated the Six
Amendment of the United States constitution.

5.

The Appellate Counsel only noticed that Turner had admitted to committing the crime, and according to the Appellate Counsel argument, Counsel felt like they had a good chance to use their <u>free pass</u> the <u>Anders</u> brief.
The AtheAppellate Counsel felt that the circumstantial evidence was sufficient to sustain conviction, but Turner did not deny shooting the victim, Turner reason for appealing to the Appellate Court, was that he did not receive a fail trial.


Reason Two for granting Turner Petition, according to Question two:

Turner was denied his constitutional rights because the trial judge denied him, his right to challenge the credibility of the states witness.
During Turner's trial, Demitria Keyes had testified for the state, which she ended up making a different statement then she gave to the investigating detective the night of the shooting. By Keyes perjuring herself, according to tha Statute 725 ILCS 5/115-10.1 (a-c), Keyes testimony should not have been submitted.

The trial judge violated Turners Six and Fourteenth Amendment of the United States Constitution, by not allowing Nicole Walls to testify to the credibility of Demitria Keyes. In <u>Chambers v. Mississippi</u>, 410 U.S. 284, 935 S.Ct. 1038, 35 .ed2d 297, The right of an accussed in a criminal trial to due process is an essence, the right to a fair oppertunity to defend against the states accussations. The rifht to confront and cross-examine witnessess and to call witnesses on one's own behalf have long been recognized as essential t to due prosess. Mr. Justice Black writing for the Court in <u>In re oliver</u>, 333 U.S. 257, 273 68 S.Ct. 499, 507, 92 L.Ed. 682 (1996), identified these rights as among the minimum essentials of a fair trial.

6.

"A persons right to reasonable notice of a charge against him, and an
opportunity to be heard in his defense a right ti his day in Court are basic i
in our system of jurisprudence; and these rights include, as a minimum, a
right to examine the witnesses against him, to offer testimony, and to be
represented by counsel."

See also, Morrissey v. Brewer, 408 U.S. 471, 488-489. 92 S.Ct. 2593, 2603-
2604, 33 L.Ed.2d 484 (1972); Jenkins v. Mckeithan, 395 U.S. 411, 428-429,
89 S.Ct. 1843, 1852-1853, 23 L.Ed. 2d 404 (1969); Specht v. Patterson, 386
U.S. 605, 610, 87S.Ct. 1209, 1212, 12L.Ed 326 (1967).


If the trial Judge would have allowed Nicole Walls to testify on behalf
of Turner, Walls would have proven that Keyes not only perjured herself, but
her statement was a result or hearsay.    The hearsay rule, which has long been
recognized and respected by virtually every state, is based on experience and
grounded in the notion that untrustworthy evidence should not be presented to
the tries of fact.

The trial Judge refused Turner the right to challenge the credibility of
Demitria Keyes and to prove her statement were hearsay.


Reason Three for granting Turner petition, according to Question three:

Due to the ineffective assistance of trial andnAppellate Counsel,Turner
is subjected to a weaver, because counsel failed to argue issues or object to
claims.  When Turner asks for counsel to beappointed to represent him, he
tells the Court that he is imcompetent to the law, so when the Court(s)
appoints counsel to a defendant, a defendant legal matters is placed in the
hands of the attorney that is appointed.

A defendant should not be punished for the ineffective assistance that we

7.

were given to him by the attorney, a defendant should not be subjected to a

waiver because he had no knoledge of the imcopetency of the attorney.

If a defendant have no knowledge of the law, he can only assume that the

attorney that were appointed to him is representing him with all they have,

the last thing a defendant thinks about is a waiver in his next petition he

files.

By a Appellate counsel filing an <u>Anders</u> brief, makes a defendant subject

to a waiver, because if a defendant file a Post-Conviction Petition tot he

Circuit Court, the Circuit Court will deny the petition, stating that the

defendant should have raised the issue on direct appeal; which makes the issue

waived, and a defendant should not be subject to this type of punishment.


Reason Four for granting Turner Petition, according to Question four:

A jury should not consider the testimony of a known perjured witness

while they are deliberating.

Demitria Keyes had perjured herself at the trial and the trial Judge

allowed the use of her statement as evidence.

Is is well established that the state's knowingly use of perjured

testimony in obtaining a criminal conviction raises a Constitutional due proce

ess violation. see, e.g., <u>Brown v. Illinois</u>, 169 Ill. 2d 94, 660 N.E. 964, 968

(1995); <u>Cihler v. Illinois</u>, 125 Ill. App. 3d 204, 465 N.E. 2d 964 (1st Dist.

1984) (ruling that petitioner stated a substantial constitutional claim based

on perjury and remanding for evidentiary hearing), <u>aff'd</u> 111 Ill. 2d 212, 489

N.E. 2d 859, 861 (1986), also United States COnstitutional Amendments X, XIV,

Illinois COnstitutional, Article 1,§ 2

A defendant chance of being acquited is slim when the trial JUdge allows

false statements to be considered as evidence.


8.

In the instant case the trial JUdge allowed the testimony of a perjured witness to be presented to the jury at the time of their deliberating, which could have made Turner chance of being convicted of a lesser charge of murder slim, by allowing the testimony to stand the trail Judge violated Turners Illinois and United States Constitutional right.

## CONCLUSION

Wherefore, the Plaintiff prays that this HONORABLE COURT grant him relief, as to allow him to be remanded back to the lower Court for a new trial, or to grant relief that this Court consider to be just and fair.

THE PETITION FOR WRIT OF CERTIORARI

SHOULD BE GRANTED

RESPECTED SUBMITTED

Patrick Turner

10.

98997

**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

November 24, 2004

Mr. Patrick Turner
Reg. No. R-03191
P. O. Box 711
Menard, IL 62259

No.  98997 - People State of Illinois, respondent, v. Patrick
            Turner, petitioner.  Leave to appeal, Appellate
            Court, First District.

    The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

    The mandate of this Court will issue to the Appellate Court on December 16, 2004.

NOTICE
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same. *Becker*

SIXTH DIVISION
JUNE 30, 2004

1-03-0236

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 12040 |
| | ) | |
| PATRICK TURNER, | ) | Honorable |
| | ) | James B. Linn |
| Defendant-Appellant. | ) | Judge Presiding |

ORDER

Following a jury trial, defendant, Patrick Turner, was convicted of first degree murder and

sentenced to 25 years' incarceration. On direct appeal, the public defender of Cook County, who

represented defendant, moved for leave to withdraw pursuant to Anders v. California, 386 U.S. 738,

18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967). Defendant did not respond to the public defender's motion.

This court granted the public defender leave to withdraw and affirmed defendant's conviction and

sentence. People v. Turner, No. 1-01-1504 (March 20, 2002) (unpublished order under Supreme

Court Rule 23). Defendant subsequently filed a pro se petition for postconviction relief. The trial

court summarily dismissed the petition. Defendant appeals contending: (1) the trial court improperly

entered a partial dismissal of his petition; (2) his petition presented the gist of a constitutional

violation based on the State's knowing use of perjured testimony; and (3) his petition presented the

1-03-0236

gist of a constitutional violation based on ineffective assistance of appellate counsel. We affirm.

## BACKGROUND

According, the State's theory of the case, defendant and the victim argued following a dice game. The argument may have been prompted by a disagreement about drug sales. Defendant left the scene of the argument, entered his girlfriend's house, and retrieved a handgun. Defendant returned, confronted the victim, and shot the unarmed man five times.

At trial, forensic evidence revealed that the victim died from five gunshot wounds, some of which were inflicted at close range.

Samuel Landingham testified that he saw defendant and the victim argue following a dice game. Defendant entered his girlfriend's house and returned after approximately five minutes. Landingham saw defendant shoot the victim twice. Landingham saw defendant say something to the victim after he fell to the ground. Landingham did not see defendant fire at the victim while he was on the ground but testified that defendant fired a total of between five and seven times.

Demitria Keyes, testified that she lived near the scene of the shooting. The night of the shooting she was on her front porch and saw defendant and the victim argue. Defendant left the argument, entered his girlfriend's house and returned. Keyes saw defendant shoot the victim once, and the victim fell to the ground. Defendant stood over the victim and continued firing. On two occasions, defendant's weapon misfired and defendant paused to clear the misfired shell from the weapon. Keyes heard a total of six or seven shots. On cross-examination, Keyes admitted telling a police detective that she was inside her house at the time of the shooting

David Sivicek, a Chicago police detective, testified that, after he was arrested, defendant gave

2

1-03-0236

a statement about the shooting. In the statement, defendant said that he lived with his girlfriend

Jerline Walls. Defendant earned a living selling drugs and candy. Defendant stated that after he

argued with the victim, he believed their might be a fist fight. Defendant looked to his friends for

support but they looked toward the ground indicating that they would not back him up in a fight.

Defendant stated that he believed that if he ran to his house and did not come back, he would be

unable to sell drugs any longer because everyone would know that he was scared.

In the statement, defendant admitted that he went into his house and recovered a handgun.

Defendant hid the gun in his jacket pocket and confronted the victim. The victim poked defendant

in the head with his finger, and another man attempted to frisk defendant for weapons. Defendant

pushed the man away and displayed the handgun. Defendant admitted shooting the victim twice.

After the victim fell to the ground, defendant stood over him and pulled the trigger four more times.

The gun misfired on the sixth shot, and defendant pulled the slide back to clear the weapon.

Defendant then fired at another man who had been with the victim and was walking away.

Defendant missed and when he attempted to fire again, the weapon was empty.

Curtis Jackson testified on behalf of defendant. Jackson testified that he is defendant's friend

and defendant's girlfriend's cousin. Jackson testified that during the argument, the victim repeatedly

threatened to kill defendant. On cross-examination, Jackson admitted that he never saw a weapon

in the victim's possession. Jackson also admitted that he saw defendant shoot the victim and saw

the victim fall to the ground. Defendant stood over the victim and pulled the trigger. The gun

jammed, defendant cleared the jam, and fired two or three additional shots into the victim.

Jerline Walls, defendant' girlfriend, testified that she and defendant had a child together. She

3

1-03-0236

lived on South Carpenter Street in Chicago with her mother and her sisters Regina Walls, Nicole Walls, and Sabrina Walls. Walls testified that she was inside her home but heard the argument outside. Walls heard the victim tell someone to "go get the gun." Shortly thereafter, defendant came into the house, went into a closet, and left again. Walls heard voices outside arguing followed by gunfire. Walls looked out her window and saw two flashes from a handgun. Defendant then entered a car and drove away. On cross-examination, Walls admitted that a statement she gave to an assistant State's Attorney did not indicate that the victim asked someone to retrieve a weapon. However, Walls testified that "they didn't write half of the things that I said that happened." Walls also admitted that defendant lived in her house.

Defendant testified that, during the dice game, the victim became angry and threw the dice away. Defendant left the game and was standing with some friends outside Walls' house. The victim, and two men defendant knew as "BJ" and "Kicking" approached defendant. The men were "talking trash." Defendant asked his friends whether they "got my back," but his friends just looked away without replying. Defendant went into the house and played with his son for less than five minutes. While in the house, defendant heard BJ outside saying "kill that b---- when he come back out here. F--- him." After hearing BJ's threat, defendant retrieved a handgun from a closet.

Defendant left the house and confronted the victim and the other men. The victim threatened to kill defendant. BJ tried to frisk defendant. Defendant testified that "I feared for my life, because they found this gun in my possession, they going to do me in regardless." Defendant saw someone he referred to as "Stone" "going for something," so he "upped," displayed his weapon. Defendant testified that the victim "just was right there." On cross-examination, defendant admitted that he

4

1-03-0236

aimed his weapon at the victim and pulled the trigger twice. Defendant testified that after the second shot he "blinked out."

## DISCUSSION

The Postconviction Act creates a three-stage procedure for postconviction petitions. See People v. Sawczenko, 328 Ill. App. 3d 888, 892 (2002). At stage one, the trial court, without input from the State, examines the petition to determine whether it is, on its face, frivolous or patently without merit. 725 ILCS 5/122-2.1 (West 2002); see also Sawczenko, 328 Ill. App. 3d at 892-93. If the petition is not dismissed at stage one, it moves to stage two where section 122-4 of the Postconviction Act (725 ILCS 5/122-4 (West 2002)) provides for the appointment of counsel for a defendant without means to procure counsel. Also at stage two, the State must either answer or move to dismiss the petition. 725 ILCS 5/122-5 (West 2002). At this stage, the trial court must determine whether the petition makes a substantial showing of a constitutional violation. Sawczenko, 328 Ill. App. 3d at 893, citing People v. Coleman, 183 Ill. 2d 366, 381 (1998). If the petition proceeds to stage three, the trial court may conduct an evidentiary hearing. 725 ILCS 5/122-6 (West 2002). An evidentiary hearing on the petition is required only when the allegations of the petition, supported by the trial record and the accompanying affidavits, make a substantial showing of a violation of a constitutional right. People v. Mitchell, 189 Ill. 2d 312, 322 (2000).

At the first stage of a postconviction proceeding, a trial court must determine whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2002); see also People v. Edwards, 197 Ill. 2d 239, 244 (2001). "A post-conviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed,

5

1-03-0236

fail to present the 'gist of a constitutional claim.' " Edwards, 197 Ill. 2d at 244, quoting People v. Gaultney, 174 Ill. 2d 410, 418 (1996). Although, the allegations of a postconviction petition are taken as true, the supreme court has consistently upheld the dismissal of postconviction petitions where the record from the original trial proceedings contradicts the defendant's allegations. People v. Rogers, 197 Ill. 2d 216, 222 (2001), citing Coleman, 183 Ill. 2d at 382. We review the summary dismissal of a postconviction petition at the first stage de novo. People v. English, 334 Ill. App. 3d 156, 162 (2002).

Defendant first contends that this case must be remanded to the trial court for second-stage postconviction proceedings because the trial court impermissibly entered a partial dismissal of his petition. Defendant relies on People v. Rivera, 198 Ill. 2d 364 (2001) and argues that because the trial court did not address all of the issues raised in his petition, its order constitutes an impermissible partial dismissal. In Rivera, our supreme court held that partial dismissals are not allowed during the first stage of a postconviction proceeding. Rivera, 198 Ill. 2d at 374. However, we find defendant's argument regarding Rivera to be patently without merit. A similar argument was recently rejected by this court in People v. Lee, 344 Ill. App. 3d 851 (2004). The Lee court held that absent some affirmative indication in the record, e.g., the appointment of counsel to assist with some of a defendant's claims, the failure to mention an issue cannot be construed as a partial dismissal. See Lee, 344 Ill. App. 3d at 855. We agree with this reasoning, and we will not interpret Rivera as creating a standard for the contents of a trial court's dismissal order in postconviction proceedings. Therefore, we reject this argument.

Defendant next contends that the trial court erred when it dismissed his petition because he

6

1-03-0236

presented the gist of a constitutional violation based on the State's knowing use of perjured testimony. Defendant argues that the existence of a prior inconsistent statement made by Keyes is sufficient to establish that the State knowingly permitted her to present perjured testimony at trial. Like defendant's previous contention, we find that this argument is patently without merit. Defendant relies heavily in his brief on the appellate court decision in People v. Cihlar, 125 Ill. App. 3d 204 (1984) for the proposition that evidence of a prior inconsistent statement is sufficient to advance a postconviction petition to the second stage. However, the reasoning of the Cihlar court was rejected by our supreme court in People v. Brown, 169 Ill. 2d 94, 106 (1995). In Brown, the supreme court held that: "In the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there has been no involvement by the State in the false testimony to establish a violation of due process." Brown, 169 Ill. 2d at 106.

In the case before us, defendant's petition establishes only that the State was aware that Keyes had previously made a statement inconsistent with her trial testimony. There is nothing from which we could conclude that the State knew that her trial testimony was false. Moreover, the prior inconsistent statement was revealed to defense counsel during discovery and fully explored on cross-examination. As a practical matter, if we accept defendant's argument, very few criminal convictions would withstand postconviction challenges, because prior inconsistent statements are one of the most commonly used forms of impeachment. Therefore, absent some allegation that the State had knowledge that Keyes' trial testimony was perjured, we must conclude that defendant's petition failed to state the gist of a constitutional violation.

Finally, defendant contends that he was denied the effective assistance of appellate counsel.

7

1-03-0236

Defendant argues that his appointed attorney's performance was deficient because he failed to argue

that: (1) the trial court erred when, as a discovery sanction, it refused to allow him to call a witness;

(2) the State made prejudicial remarks during closing arguments; and (3) the State knowingly used

the perjured testimony of Keyes.

Claims of ineffective assistance of counsel are judged against the familiar Strickland

standard. See Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

A defendant must show both a deficiency in counsel's performance and prejudice resulting from the

alleged deficiency. People v. Edwards, 195 Ill. 2d 142, 162 (2001), citing Strickland, 466 U.S. at

687, 80 L. Ed 2d at 693, 104 S. Ct. at 2064. To show a deficiency in counsel's performance, a

defendant must establish that counsel's performance fell below an objective standard of

reasonableness. Edwards, 195 Ill. 2d at 162-63. To demonstrate prejudice, a defendant must

establish that there is a reasonable probability, that, but for the alleged errors, the outcome of the

proceedings would have been different. Edwards, 195 Ill. 2d at 163. A reasonable probability is a

probability sufficient to undermine confidence in the outcome of the proceedings. Strickland, 466

U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

To prevail in a claim of ineffective assistance a defendant must satisfy both the performance

and prejudice prongs of the Strickland analysis. See Edwards, 195 Ill. 2d at 163. Accordingly, a

court may proceed directly to a consideration of the prejudice prong and need not consider whether

counsel's performance was deficient in the absence of a showing of prejudice as the result of the

alleged deficiencies. Edwards, 195 Ill. 2d. at 163.

The performance of appellate counsel is judged by the same standard. A defendant who

8

1-03-0236

claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts

demonstrating that such failure was objectively unreasonable and that counsel's decision prejudiced

defendant. People v. Enis, 194 Ill. 2d 361, 377 (2000). If the underlying issue is not meritorious,

then defendant has suffered no prejudice. Enis, 194 Ill. 2d at 377.

Defendant first argues that appellate counsel was ineffective for failing to argue that the trial

court erred when excluded the testimony of Nicole Walls, who, according to an offer of proof, would

testify that she saw Demetria Keyes coming from the store rather than on the porch as she testified.

A criminal defendant is required to disclose the witnesses that he intends to call prior to trial and the

failure to do so may result in sanctions including exclusion. See People v. McKinney, 117 Ill. App.

3d 591, 596 (1983) citing 87 Ill. 2d R. 413(d)(i), 415(g)(i). Whether or not to impose a sanction is

a matter within the trial court's discretion and that decision will not be overturned on appeal absent

an abuse of that discretion. McKinney, 117 Ill. App. 3d at 596.

Defendant argues that the facts of this case so closely resemble the facts of People v. Daniels,

75 Ill. App. 3d 35 (1979), that the failure to make an argument based on Daniels constituted

ineffective assistance. We find defendant's reliance on Daniels misplaced. There is a superficial

similarity between the cases because, as in Daniels, defendant wished to impeach a prosecution

witness with testimony that the witness was elsewhere at the time of the offense. However, in

Daniels the defendant's hoped to impeach the sole eyewitness to the crime. Here, although she

offered what was arguably the most damaging testimony, Keyes was only one of several witnesses,

including defendant's own witness, who testified that defendant shot the victim, and defendant

admitted shooting the victim. Furthermore, in Daniels the excluded witness would have testified that

9

1-03-0236

the State's witness was never at the scene of the crime. Here, the offer of proof is unclear but Nicole

would only have been able to place Keyes at different vantage point or shift the time line of her

testimony by a few moments. Most importantly, in Daniels, the reviewing court found it significant

that the State argued that the defendant "presumably" knew of the witnesses testimony because they

had both been incarcerated in the Cook County jail. Here, in contrast, there is ample reason to

assume that Nicole, and the substance of her proposed testimony were well known to defendant.

Nicole was the sister of defendant's girlfriend, who did testify on defendant's behalf. Moreover,

Nicole lived in the same house where defendant sometimes stayed and where he retrieved his

weapon. Defendant clearly knew of the existence of this witness and had the ability to contact her.

We believe that the circumstances of the case before us are closer to those in McKinney, where the

reviewing court held that the sudden appearance of a witness during a break in the trial strongly

suggested recent fabrication. McKinney, 117 Ill. App. 3d at 596. Here, as in McKinney, defense

counsel provided no adequate explanation for the failure to seek out Nicole's testimony until late in

the trial. See McKinney, 117 Ill. App. 3d at 596. Accordingly, we conclude that the trial court did

not abuse its discretion when it excluded Nicole's testimony as a discovery sanction. Therefore,

because the underlying issue lacks merit, appellate counsel was not ineffective for failing to raise it.

Defendant next argues that the State made several improper comments during closing

argument. Generally, prosecutors enjoy wide latitude in closing arguments. People v. Greer, 336

Ill. App. 3d 965, 980 (2003). Improper comments warrant reversal only when they result in

substantial prejudice to a defendant, when the comments are such that the verdict would have been

different had the comments not been made. Greer, 336 Ill. App. 3d at 980. The comments made in

10

1-03-0236

closing argument must be considered in the proper context by examining the entire closing arguments of both the State and the defendant. People v. Kliner, 185 Ill. 2d 81, 154 (1998).

In the case before us, we do not find it necessary to address individually the allegedly improper comments made by the State. We conclude that even if some of these comments were improper, defendant cannot establish that substantial prejudice resulted. The evidence against defendant was simply overwhelming. The victim was shot five times. Defendant admitted shooting the victim twice and provided no explanation for the remaining shots. The forensic evidence revealed that several gunshots were inflicted on the victim from close range. Keyes testified that she saw defendant stand over the victim as he lay on the ground and fire into his body. Jackson admitted on cross-examination that he had seen defendant fire into the victim while he lay on the ground, and defendant's statement following his arrest corroborated these accounts. Defendant's claim of self defense was weak and provided no explanation for why he chose to confront the individuals who allegedly threatened his life and no explanation for why he shot the victim five times after seeing someone else "go for something." In light of the strength of the State's case against defendant, we cannot conclude that any of the allegedly improper comments during closing argument were a substantial factor in his conviction. Accordingly, we conclude that this issue lacked substantive merit and appellate counsel was not ineffective for failing to raise it.

Defendant finally argues that appellate counsel was ineffective for failing to raise the perjured testimony issue. We previously concluded that that issue lacks merit. Accordingly, appellate counsel was not ineffective for failing to raise in on direct appeal. Therefore, defendant's petition did not state the gist of a meritorious claim based on the ineffective assistance of appellate counsel.

11

1-03-0236

## CONCLUSION

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

TULLY, J., with GALLAGHER and FITZGERALD SMITH, JJ., concurring.

12



# OFFICE OF THE STATE APPELLATE DEFENDER
## FIRST JUDICIAL DISTRICT

203 NORTH LASALLE STREET
24TH FLOOR
CHICAGO, ILLINOIS 60601
TELEPHONE: 312/814-5472
FAX: 312/814-1447

**MICHAEL J. PELLETIER**
DEPUTY DEFENDER

January 27, 2003

Mr. Patrick Turner
Register No. R-03191
Stateville Correctional Center
P.O. Box 112
Joliet, IL 60434

<u>People v. *Patrick Turner*</u>
Indictment No.    99 CR 12040

Dear Mr. Turner:

        This letter is to inform you that this office has been appointed to represent
you in your case on appeal. Enclosed is an information sheet which explains the
procedures we follow in handling appeals and a timetable which explains the
approximate length of time the appeal process is expected to take, beginning with
the date the notice of appeal is filed.

        A specific attorney in our office will not be assigned to your case until we
have received your complete record. We usually receive the complete record six
to ten months from the date of our appointment, but there are instances where it
takes even longer. When we do receive the record, you will be notified of the
attorney assigned to your case. From that point on you should direct any
questions to the attorney assigned to your case. The named attorney will handle
your case unless another attorney's caseload would permit him/her to work on
your case sooner. In the event that your case is reassigned, you will be notified.

        Prior to the assignment of your case to an attorney, should you have any
questions, please do not hesitate to write Susan Carr, our senior paralegal. Due to
budget constraints, Ms. Carr cannot accept your collect calls. If she needs to
speak to you, arrangements will be made to accept your collect call.

        Please be aware that Ms. Carr is not an attorney and cannot answer your
legal questions. No attorney will be able to answer your legal questions until we
have a complete record on your case. The appellate process is unfortunately slow.
Know we are doing all we can to move along your case.



## OFFICE OF THE STATE APPELLATE DEFENDER
### FIRST JUDICIAL DISTRICT

203 NORTH LASALLE STREET
24TH FLOOR
CHICAGO, ILLINOIS 60601
TELEPHONE: 312/814-5472
FAX: 312/814-1447

MICHAEL J. PELLETIER
DEPUTY DEFENDER

June 24, 2004

Mr. Patrick Turner
Register No. R-03191
Pontiac Correctional Center
P.O. Box 99
Pontiac, IL 61764

RE: *People v. Patrick Turner*
Indictment No.:99 CR 12040

Dear Mr. Turner:

I am sorry we were unable to accept your collect call today. Due to budget constraints, our office can only accept collect calls that have been arranged in advance.

If your case has been assigned to an attorney, he or she has been notified of your call. Be assured that your attorney will arrange a call with you if necessary.

In the meantime, should you have any questions or comments, please write.

Sincerely,

*Michael J. Pelletier*

MICHAEL J. PELLETIER
Deputy Defender

cc: Steven W. Becker

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC 20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

April 25, 2005

Mr. Patrick Turner
Prisoner ID R03191
P.O. Box 711
Menard, IL 62269-0711

      Re:  Patrick Turner
           v. Illinois
           No. 04-8806

Dear Mr. Turner:

    The Court today entered the following order in the above-entitled case:

    The petition for a writ of certiorari is denied.

                Sincerely,

                *William K Suter*

                William K. Suter, Clerk

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 2.5
### Eastern Division

Patrick Turner

                    Plaintiff,

v.                                          Case No.: 1:06–cv–02277
                                            Honorable James B. Zagel

Austin S. Randolph Jr.

                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, September 26, 2006:

      MINUTE entry before Judge James B. Zagel : Motion hearing held on 9/26/2006 regarding motion for to dismiss Section 2254 petition as time–barred. Motion to dismiss Section 2254 petition as time–barred is granted. Civil case terminated. Mailed notice(drw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.



FROM:
PATRICK TURNER
REGISTERED IDOC INMATE No./A-03191
IL RIVER CORRECTIONAL CENTER
1100 WEST MAIN
CANTON, IL 61520

TO:
MICHAEL W. DOBBINS, CLERK), ROOM 2044
219 SOUTH DEARBORN STREET, 20TH FLOOR
CHICAGO, IL 60604

THIS CORRESPONDENCE
IS FROM AN INMATE
INCARCERATED IN
AN ILLINOIS DEPARTMENT
OF CORRECTIONS

PRIVILEGED COMMUNICATION — LEGAL MAIL

FROM:
PATRICK TURNER
REGISTERED IDOC. INMATE NO.(K-0319)
IL RIVER CORRECTIONAL CENTER
P.O. BOX 1900
CANTON, IL. 61520

TO:
LISA MURRAY MADIGAN, ATTORNEY GENERAL
OFC/STATE OF ILLINOIS ATTORNEY GENERAL
CRIMINAL APPEALS DIVISION, 12TH FLOOR
100 WEST RANDOLPH STREET
CHGO, IL 60601

PRIVILEGED COMMUNICATION - LEGAL MAIL

C.A. 7 (Ill) 2001, The mailbox Rule" holds that prisoners who do not have a lawyer are deemed to file a notice of appeal from an adverse Judgment when they deliver the notice to the prison authorities, F.R.A.P. Rule 4, 25, 28 U.S.C.A - Lee V. County of Cook 2 Fed. Appx. 571. - Fed Cts 669

C.A. 9 (Cal) 2002, under the "mailbox Rule." a legal Document is deemed filed on the dat a prisoner Delivers it to the prison authorities for filing by mail - Lott V. muller. 304 F.3d 918. - Time 3.5

C.A. 9 (Cal) 2003 under "mailbox Rule" prose prisoner's State Habeas petition is deemed filed at moment prisoner Delivers it to prison authorities for forwarding to Clerk of court - Stillman V. Lamaeque, 319 F. 3d 1199. - Hab Corp 603.

/s/ Patrick Turner R03191

Subscribed and sworn to before me
this ___ day of _November_, 2006
_____
Notary Public

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge Zagel | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 2277 | **DATE** | November 26, 2007 |
| **CASE TITLE** | TURNER v. RANDOLPH | | |

**DOCKET ENTRY TEXT:**

Treating defendant's letter [19] as a post trial motion to reconsider, I deny it.

---

### STATEMENT

This is a prisoner case that I dismissed as time-barred in September of 2006. Long past the time for appeal had expired, Petitioner wrote a letter asking me to reconsider my decision and also to give further explanation for my decision. The request came too late and, indeed, looked more like a request for an explanation than a motion to reconsider or a motion under Rules 59 or 60. In any event, the case is closed and, were I to consider it, Petitioner's letter does not show how he complied with the mailbox rule. For purposes of docket control, I will treat this as a post-ruling motion and deny it.

*IN THE*

US DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION AT CHICAGO

PATRICK TURNER                    )
*Plaintiff,*                      )
                                  )    *Case No.* _____
              v.                  )
                                  )
AUSTIN S. RANDOLPH, JR.  (WARDEN) )
*Defendant*                       )

## PROOF/CERTIFICATE OF SERVICE

TO: LISA MURRAY MADIGAN            TO: MICHAEL W. DOBBINS

ATTY. GENERAL OF THE STATE OF ILLINOIS    CLERK OF THE US DISTRICT COURT

100 W. RANDOLPH STREET, 12TH FLOOR    NORTHERN DISTRICT OF ILLINOIS
                                      EASTERN DIVISION AT CHICAGO
CHGO. IL 60601                        219 SOUTH DEARBORN STREET, 20TH FLOOR
                                      CHGO. IL 60604

*PLEASE TAKE NOTICE* that on _____ APRIL 13 _____, 20 06 , I have placed the
documents listed below in the institutional mail at IL RIVER _____ Correctional Center,
properly addressed to the parties listed above for mailing through the United States Postal
Service: I MAILED TO THE ABOVE NAMED INDIVIDUALS ONE COPY OF "PETITION FOR
WRIT OF HABEAS CORPUS - PERSON IN STATE CUSTODY FOR THE NORTHERN DISTRICT
OF ILLINOIS, EASTERN DIVISION AT CHICAGO.

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that I am a named party in the above action, that I have read the above
documents, and that the information contained therein is true and correct to the best of my
knowledge.

DATE: 4-13-06 _____

/s/ *Patrick Turner*
NAME: PATRICK TURNER
IDOC#: R+03191

IL RIVER _____ Correctional Center
P.O. BOX ___ 1900
CANTON _____, IL 61520

# STATE OF ILLINOIS DEPARTMENT OF CORRECTIONS
## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

**Name:** ▓▓▓▓▓▓▓▓▓     **IDOC Number:** ▓▓▓▓▓     **Race:** BLK

**Hearing Date/Time:** 1/29/2008  11:25 AM    **Living Unit:** IRI-3-01-T4 ▓▓▓▓ **Orientation Status:** N/A

**Incident Number:** 200800345/1 - IRI     **Status:** Final

| Date | Ticket # | Incident Officer | Location | Time |
|---|---|---|---|---|
| 1/19/2008 | 200800345/1-IRI | TAYLOR, CHAD B | R4 HOUSE, WING A | 04:45 PM |

| Offense | Violation | Final Result |
|---|---|---|
| 301 | Fighting | Guilty |
| | Comments:Pettis R51148 | |

| Witness Type | Witness ID | Witness Name | Witness Status |
|---|---|---|---|

**No Witness Requested**

## RECORD OF PROCEEDINGS

Charges of DR504 301 read, Turner ID'd by state ID card, I/M pleads guilty states he and Pettis were arguing in the chow hall
over a tray. States when they got back to the wing it kind of started as horseplay(pushing and shoving) and Pettis punched
him so he punched Pettis back.

## BASIS FOR DECISION

1)Staff observation that on 1/19/08 at approx. 4:45pm I/M's Pettis R51148 and Turner R03191 were observed boxing and
striking each other in the body area.
2)I/M's own admission to Fighting with I/M Pettis.
Turner stated he would have no problems returning to population at IRI. Responsibility Waiver signed.

## DISCIPLINARY ACTION  *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| 1 Months C Grade | 1 Months C Grade |
| 1 Months Segregation | 1 Months Segregation |
| **Basis for Discipline:**nature of offense | |

## Signatures
### Hearing Committee

| | | Signature | Date | Race |
|---|---|---|---|---|
| KEITHLEY, MICHAEL S - Chair Person | | *[signature]* | 01/29/08 | WHI |
| SLAUGHTER, ANITA K | | *[signature]* | 01/29/08 | BLK |

Recommended Action Approved

## Final Comments: N/A

AUSTIN  RANDOLPH / RSB  2/4/2008     *[signature]*    02/04/08

**Chief Administrative Officer**     **Signature**    **Date**

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

*[signature]*      *[handwritten date/time]*

**Employee Serving Copy to Committed Person**     **When Served -- Date and Time**

Run Date: 2/6/2008 07:59:53      Page 1 of 1

2008C 3451

State of Illinois - - Department of Corrections
**DISCIPLINARY REPORT**

Page 1 of 1

☒ Disciplinary Report __1-19-08__
Date

☐ Investigative Report _____
Date

Committed Person: __Turner__   No. __R03191__   Facility: __I.R.C.C.__

Observation Date: __1-19-08__   Time: __Approx 445 am__   Location: __D4 Upper A-Wing__

__C. Taylor__
PRINT Employee's Name

__C. Taylor   1-19-08   5:25__
Employee's Signature/Date/Time

Offense: No. C-B __301 - Fighting__

Observation: __On the above date and approx time. This RO observed I/m Turner R03191 and I/m Pettis R57148 boxing and striking each other to the body area. This RO told them to stop over the intercom but they continued. This RO the notified c/o wilcoxen of the situation by the time c/o wilcoxen got to upper A-wing they had returned to there cells. I/m Turner R03191 is a Porter and had reason to be out of his cell. E.O.R. -__

Witnesses, if any: __c/o wilcoxen, c/o sappington__

NOTE: Use continuation page if necessary to describe observation and/or list witnesses.

☒ Temporary Confinement   ☐ Investigative Status   Reasons: __Nature of Offense__

__Lt. C. Neal__
PRINT Name

__Lt. C. Neal   1-19-08__
Shift Supervisor's Signature and Date
(For Community Correctional Centers, Chief Adm. Off.)

☐ Confinement Reviewed by Reviewing Officer   Comment: _____

_____
PRINT Name

_____
Signature/Date

☒ MAJOR, submitted to Adjustment Committee   ☐ MINOR, submitted to Program Unit

__Lt Huggins__
PRINT Name

__Huggins   1-19-08__
Reviewing Officer's Signature and Date

☒ Reviewed by Hearing Investigator   __S Arnold__
(Adult Division Major Reports Only)   PRINT Name

_____   1-23-08
Signature and Date

**PROCEDURES APPLICABLE TO ALL HEARINGS ON INVESTIGATIVE AND DISCIPLINARY REPORTS**

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

**PROCEDURES APPLICABLE TO HEARINGS CONDUCTED BY THE ADJUSTMENT COMMITTEE ON DISCIPLINARY REPORTS**

You may ask that witnesses be interviewed and, if necessary, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing. If you are found guilty of a serious rule violation, you may be placed in confinement and/or lose privileges, and/or be required to make restitution. In addition, juveniles may receive a delay in recommended parole.

_____
Committed Person's Signature and Number

Committed Person Refused to Sign ☒

__C. Mikes__
PRINT Serving Employee's Name

__C. Mikes__
Serving Employee's Signature

__1-20-08__   __3:00 am/pm__
Date and Time Served

I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

Offense Date: _____

_____
Committed Person's Signature and Number

— — — — (DETACH AND RETURN TO THE ADJUSTMENT COMMITTEE OR PROGRAM UNIT PRIOR TO THE HEARING) — — — —

I would like the Adjustment Committee or Program Unit to consider calling the following witnesses regarding disciplinary report of _____
Date

NAME OF WITNESS: _____   Number/Cell/Title: _____

Witness can testify to: _____

NAME OF WITNESS: _____   Number/Cell/Title: _____

Witness can testify to: _____

DC 7205 (Rev. 4/96)   Distribution: 1) Master File; 2) Committed Person;
IL 426-0361   3) Facility; 4) Facility

Committed Person's Name and Number



**Illinois**
**Department of**
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker  Jr.**
Director

Illinois River Correctional Center  /  Rt. 9 West  /  P.O. Box 999  /  Canton, IL  61520 /  Telephone: (309) 647-7030  /  TDD: (800) 526-0844

# M E M O R A N D U M

**DATE:**     April 7, 2008

**TO:**     **Turner, Patrick R03191 1D-17**

**FROM:**     Lisa Bishop, Medical Records Director (LBishop) MRD

**SUBJECT:**     Insufficient Funds

---

The money voucher submitted for Medical Record copies on April 2, 2008 has been returned and marked as "Insufficient Funds".  Copies will not be made.  To receive copies in the future, you must submit a new request when you have the proper amount in your trust fund.

LB

Cc:    Medical Record
         File

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

IRCC ~~Menard Correctional~~ Center

| Offender Information: | | |
|---|---|---|
| Turner | Patrick | ID#: R63191 |
| Last Name | First Name | MI |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 0815 L-2008 | RN Note - MDSC - F/U X-Ray | |
| | 98.0, R.16, 116/78 — 181# | 1. |
| | M.D. Note: | |
| | Sr 29 Yo Bm here for the ⊙ Rt hand | — Below Rt Elbow |
| | injury. P exam c/o. | ⊝ CAP placed Rt buxks |
| | ⊙, Rt hand | — Repeat Rt hand |
| | unchanged | X-ray in 5 wks ✓ |
| | X-ray Rt hand — fracture base of | — Fu 6 wks 3-13-08 |
| | 5th metacarpal bone. | — Low Bunk x 8 wks ✓ |
| | | — RICE c̄ s/s worsening |
| | (A) — ① fracture (R) 5th metacarpal | |
| | bone. | |

SETH Note
MEDIC S, M.D.
DOC 0084 (Eff. 4/2002)
(Replaces DC 7147)

bution: Offender's Medical Record



## ILLINOIS DEPARTMENT OF CORRECTIONS
### Offender Outpatient Progress Notes



__Illinois River Correctional____ Center

Offender Information:

Last Name: _Turner_  First Name: _Patrick_  MI: ___  ID#: _R03191_

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 3-24-08 0900 | X-Ray Tech Note: | |
| | Rt. Hand X-Ray Completed | A Vesseler, R.T. (R) |
| 900 3-24-08 | RN note: W | |
| | Cast removed: R hand | 1. RTC FWk 8/31/08 |
| | splint and Ace applied | |
| | C R hand. | |
| | A: Heal fx R metacarpa | |
| | | |

Printed on Recycled Paper

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

TO THE ~~APPELLATE~~ District COURT OF ILLINOIS

_____
(Appellate Court Number)

PEOPLE OF THE STATE OF ILLINOIS    )
                              )
            vs.            ) (INDICTMENT NO.)
                              ) (Judge)
Patrick Turner             )

## LATE NOTICE OF APPEAL

An appeal is taken from the order or judgment described below::

(1)    APPELLANT'S NAME: Patrick Turner

(2)    APPELLANT'S ADDRESS: P.O.Box 1900 Canton, IL 61520

(3)    APPELLANT'S ATTORNEY: PRO SE
        ADDRESS: P.O. Box 1900 Canton, IL 61520

(4)    OFFENSE: Murder

(5)    JUDGMENT: guilty         PLEA/FINDING/VERDICT

(6)    DATE OF JUDGMENT OF SENTENCE: 3-9-01

(7)    SENTENCE: 25 years

(8)    STATE WHY YOU BELIEVE YOUR APPEAL HAS MERIT: because of the
    Mailbox rule as well as time bars.

(9)    STATE WHY YOUR FAILURE TO FILE A NOTICE OF APPEAL
    WITHIN 30 DAYS WAS NOT DUE TO YOUR CULPABLE
    NEGLIGENCE: because at the time I was locked up in
    Segregation and had a cast on my writing hand.

WHEREFORE, appellant prays the Court to grant the late notice of
appeal, pursuant to Supreme Court Rule 606(c).

                        Patrick Turner
                        APPELLANT

Revised Jan 2002

STATE OF ILLINOIS            )
                            )
COUNTY OF_____ )


## AFFIDAVIT


Patrick Turner _____ being first duly sworn on oath deposes and says:

1. I am the Defendant in this cause.   Indictment No._____.

2. I was convicted of _Murder_____ on the date of ~~~~~ 9-6-00
   and was sentenced to _25 years_ on the date of _3-9-01_
   by Judge _Lyn_____.

3. (State reasons that you did not file a notice of appeal in this case within
   30 days of sentencing.) _I at the time was in segragation and could_
   _not get to the law library. And I also had a cast on_
   _my writing hand._

4. The delay in filing a notice of appeal is not attributable to defendant/
   appellant's culpable negligence.

5. (State why you believe your appeal has merit.) _because I have meritable_
   _time bar issues as well as the mailbox rule._
   _____

6. Defendant/appellant does declare and affirm that all facts stated in the
   attached motion and in this affidavit are true and accurate to the best of his
   knowledge and belief.

                              SIGNED: _Patrick Turner_
                                      DEFENDANT


SUBSCRIBED AND SWORN TO
before me this _6th_ day of
_March_____, 2008.


_Don O. B_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Don A. Burkhart
Notary Public, State of Illinois
My Commission Exp. 08/22/2008


Revised Jan 2002

## AFFIDAVIT

I, _Patrick Turner_ _____, being duly sworn do repose and state that the
attached _Appeal for Federal Hab._ is true and correct in substance and fact to the best of
my knowledge.

_/s/ PATRICK TURNER_
Petitioner

_# R03191_

Subscribed and sworn to before me this
_6th_ day of _March_ 2008

_Don Q._
Notary Public

**OFFICIAL SEAL**
Don A. Burkhart
Notary Public State of Illinois
My Commission Exp. 08/22/2008

_Illinois River_ Correctional Center
P.O. Box _1900_

_Canton_, Illinois _61520_

_8/22/08_
Expiration of Commission

## NOTICE OF FILING

TO: _Clerk of the U.S. District_   TO: _Attorney General's Office_   TO: _____
_Court._        _C/O Lisa M. Madigan_
_United States Courthouse_  _100 W. Randolph St._
_219 South Dearborn St._  _12th Floor_
_Chicago, IL 60604_  _Chicago, IL 60610_

Please take notice on _March 6_, 20_08_, I filed with _the U.S._
_District_ Court the attached _Appeal on Federal_, _(2) two_
_Habas Corpus_
copy(ies) of which are served on you.

_/s/ PATRICK TURNER_

## AFFIDAVIT OF SERVICE

STATE OF ILLINOIS )
                  )
COUNTY OF         )

I, _Patrick Turner_ _____, being sworn state that I served the attached
notice on the above named person(s) by placing a true and correct copy in an envelope(s),
addressed as shown above, with the proper U.S. postage on each and deposited the envelope(s) in
the U.S. Mail at _Ill River. C.C. Canton_, Illinois, _61520_, on or about the hour of
_4:00 pm_ on _March 6_, 20_08_.

_/s/ PATRICK TURNER_

Revised Jan 2002

UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS- EASTERN DIVISION

PATRICK TURNER                    )         CASE NUMBER:
                    PLAINTIFF     )         1:06-cv-02277
                                  )
                                  )
         VS.                      )
                                  )         THE HONORABLE:
                                  )         JAMES B. ZAGEL
THE PEOPLE OF THE                 )
STATE OF ILLINOIS                 )
                    DEFENDANT     )

---

## MOTION FOR RECONSIDERATION OF EXHIBITS

NOW COMES PATRICK TURNER , PRO SE, RESPECTFULLY PETITIONS THIS
HONORABLE COURT TO REVIEW THE FOLLOWING EXHIBITS. THE CAUSE FOR
DISMISSAL CAME UNDER THE MAILBOX RULE, BUT UNDER RULE 59 or 60,
I CAN SHOW HOW THE MAILBOX RULE WAS NOT VIOLATED. PLEASE REVIEW
THE FOLLOWING EVIDENCE SUBMITTED IN THESE EXHIBITS.

    1) EXHIBIT 1, ASSIGNMENT OF COUNSEL-JAN. 27, 2003
    2) EXHIBIT 2, CORRESPONDENCE FROM COUNSEL-JUN. 24, 2004
    3) EXHIBIT 3, LETTER OF DENIAL ON POST-APR. 25, 2005
    4) EXHIBIT 4, FEDERAL HABEAS CORPUS FILED-APR. 13, 2006
    5) EXHIBIT 5, ATTORNEY GENERAL'S CORRESPONDENCE OF
                  DISMISSAL UNDER THE MAILBOX RULE-SEPT. 26, 2006
    6) EXHIBIT 6, TRUST FUND TRANSACTION STATEMENT-APR. 28, 2006
    7) EXHIBIT 7, PHOTO COPY OF POST MARK POSTAGE-APR. 21, 2006
    8) EXHIBIT 8, DOCUMENT SHOWING MAILBOX RULE DOES NOT APPLY-NOV.8,2006
    9) EXHIBIT 9, JUDGES ORIGINAL REENTERATION OF THE MAIL-
                  BOX RULE-FROM SEPT. 26, 2006-NOV. 26, 2007

File Date: _June 20, 2008_

Case No: _08cv 3551_

ATTACHMENT # _7_

EXHIBIT _____

TAB (DESCRIPTION)

_____

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America ex rel. PATRICK TURNER, | ) ) ) | |
| Petitioner, | ) ) | No. 06 C 2277 |
| v. | ) ) | The Honorable James B. Zagel, |
| AUSTIN S. RANDOLPH, JR., | ) ) | Judge Presiding. |
| Respondent. | ) ) | |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Respondent files paper copies of the below-named exhibits in support of his

Notice of Motion To Dismiss §2254 Petition As Time-Barred.

Exhibit A: *People v. Turner*, No. 99CR1204001 (Cir.Ct. Cook Cty. Mar. 9, 2001) (sentencing petitioner to 25 years' imprisonment for first degree murder);

Exhibit B: Brief In Support Of Petition To Withdraw As Counsel On Appeal Pursuant To *Anders v. California*, 386 U.S. 738 (1967), *People v. Turner*, No. 1-01-1504 (Ill.App.Ct. 1st Dist. 2002);

Exhibit C: *People v. Turner*, No. 1-01-1504 (Ill.App.Ct. 1st Dist. Mar. 20, 2002) (finding no issues of arguable merit, allowing counsel to withdraw, and affirming judgment);

Exhibit D: Petition For Post Conviction Relief, *People v. Turner*, No. 99CR1204001 (Cir.Ct. Cook Cty. 2002);

Exhibit E: Notice Of Filing, *People v. Turner*, No. 99CR1204001 (Cir.Ct. Cook Cty. 2002);

Exhibit F: Proof Of Service, *People v. Turner*, No. 99CR1204001 (Cir.Ct. Cook Cty. 2002);



Exhibit G:    Affidavit Of Verification, *People v. Turner*, No. 99CR1204001
              (Cir.Ct. Cook Cty. 2002);

Exhibit H:    Transcript of Report of Proceedings at A-1 to A-4, *People v.
              Turner*, No. 99CR1204001 (Cir.Ct. Cook Cty. 2002) (denying
              post-conviction relief);

Exhibit I:    Brief And Argument For Petitioner-Appellant, *People v. Turner*,
              No. 1-03-0236 (Ill.App.Ct. 1st Dist. 2004);

Exhibit J:    Brief And Argument For Respondent-Appellee, *People v. Turner*,
              No. 1-03-0236 (Ill.App.Ct. 1st Dist. 2004);

Exhibit K:    Reply Brief And Argument For Petitioner-Appellant, *People v.
              Turner*, No. 1-03-0236 (Ill.App.Ct. 1st Dist. 2004);

Exhibit L:    *People v. Turner*, No. 1-03-0236 (Ill.App.Ct. 1st Dist. June 30,
              2004) (affirming denial of post-conviction relief);

Exhibit M:    Petition For Leave To Appeal, *People v. Turner*, 824 N.E.2d 290
              (Ill. 2004) (No. 98997);

Exhibit N:    *People v. Turner*, 824 N.E.2d 290 (Ill. 2004) (denying leave to
              appeal); and

Exhibit O:    *Turner v. Illinois*, 544 U.S. 1003 (2005) (denying certiorari).


September 18, 2006                          Respectfully submitted,


                                            LISA MADIGAN
                                            Attorney General of Illinois

                                    BY:     s/ RETHA STOTTS
                                            RETHA STOTTS, Illinois Bar #6270680
                                            Attorney for Respondent
                                            100 West Randolph Street, 12th Floor
                                            Chicago, Illinois 60601
                                            Tel. (312) 814-2139
                                            rstotts@atg.state.il.us


-2-

hands. (R.U. 118) Jackson fell to the ground after being
shot. (R.U. 120) Landingham estimated that the defendant fired
a total of seven shots at Jackson. (R.U. 120) The defendant
then left the scene in a vehicle accompanied by another person.
(R.U. 120)

Demetria Keyes testified that at about 10:00 P.M. on
September 11, 1998 she returned to her home which was located
directly across the street from the house in which the defendant
was staying. (R.U. 135,136,140) Ms. Keyes related
that she proceeded to sit on her porch. (R.U. 137) Jackson,
whom she had known for about two years, was about to open her
gate to speak to her when the defendant, whom Ms. Keyes knew as
"Frosty", said something to Jackson. (R.U. 138,139) Jackson
then turned, walked away from Ms. Keyes's gate, and began to
argue with the defendant in front of the defendant's house.
(R.U. 140)

Ms. Keyes related that she observed the defendant abruptly
turn and proceed into his (defendant's) house. (R.U. 140) The
defendant quickly exited the house and he walked directly over
to where Jackson was standing on the sidewalk. (R.U. 140)
Jackson and the defendant resumed their argument. (R.U. 140)
Ms. Keyes testified that she then heard a gunshot. (R.U. 141)
She saw the defendant turn and start to run away. (R.U. 142)
But the defendant returned to Jackson who was lying on the
ground and he proceeded to stand over Jackson and to fire
repeatedly at Jackson. (R.U. 142,143) Ms. Keyes noticed that
during the shooting the defendant had to unjam his gun several

3

times in order to keep firing at Jackson. (R.U. 143) Ms. Keyes then ran to her phone and she called Jackson's mother. (R.U. 143) Ms. Jackson, who lived down the street, rushed to the shooting scene where she observed the lifeless body of her son. (R.U. 107)

Ms. Keys testified that she spoke to the police after the shooting. (R.U. 144) She acknowledged that she did not tell the police everything which she had told the jury. (R.U. 144, 151,152). She explained that when she spoke to the police following the shooting she was very upset and scared. (R.U. 144)

Assistant Medical Examiner Dr. Nancy Jones testified that she performed an autopsy on the body of Jaha Jackson. (R.W. 8) In the course of her examination she observed a gunshot entrance wound near Jackson's ear, a gunshot entrance wound near Jackson's left armpit, a gunshot entrance wound on Jackson's lower left chest, another gunshot entrance wound on the lower left chest, and a gunshot entrance wound to the left abdomen region. (R.W. 9-12) All five entrance wounds were on the left side of Jackson's body. (R.W. 12) Dr. Jones stated that the location of the entrance wounds was consistent with a person being shot while lying on his right side. (R.W. 29)

Dr. Jones testified that she recovered a partially fragmented copper-jacketed bullet from Jackson's head and a fully copper-jacketed bullet from Jackson's right chest. (R.W. 20,22) She also recovered an old oxidized bullet with scar tissue adhering to it. (R.W. 22,30) The old bullet was located near the cervical spine. (R.W. 22,26) Dr. Jones testified that

4     9

the old bullet had been in Jackson's body prior to Jackson's
wounding by the other two recovered bullets. (R.W. 30) Dr.
Jones placed the three bullets into envelopes for examination at
the Illinois State Police Crime Laboratory. (R.W. 24-26)

Dr. Jones concluded that the cause of Mr. Jackson's death
was multiple gunshot wounds and that the manner of his death was
homicide. (R.W. 15)

Officer Leonard Stocker, a forensic investigator assigned
to the Chicago Police Crime Laboratory, testified that he and
his partner photographed the crime scene at 6829 S. Carpenter in
the late evening hours of September 11, 1998. (R. W. 33-36)
The officers photographed the immediate area of the crime's
location and the body of the victim, Jaha Jackson. (R.W. 37-49)
In particular the officers took photos of a fired bullet that
was located lying next to Jackson's right forearm and a fired
bullet that was located lying on the curb between Jackson's legs
and ankles. (R.W. 42) Additionally, the officers discovered a
fired bullet which was underneath Jackson's body. (R.W. 42)

Officer Stocker and his partner also recovered an expended
cartridge case located about eight feet from Jackson's head, a
cartridge case located near the fence of the defendant's front
yard, and a live cartridge case lying about 6 feet from
Jackson's ankles. (R.W. 42-44) Officer Stocker identified an
evidence envelope which was marked as containing two spent
Winchester .380 auto cartridge cases found on the front concrete
walkway and sidewalk at 6829 S. Carpenter. (R.W. 46) Stocker
also identified an evidence envelope which was marked as

10

containing three fired bullets found on the sidewalk beneath the
victim, by the victim's feet, and by his right hand at 6829 S.
Carpenter.  (R.W. 47)  This envelope was labeled as a biohazard
because the bullets could possibly have been contaminated with
blood.  (R.W. 47,48)  Finally, Officer Stocker identified an
evidence envelope which was described as containing a live NCCIR
.380 auto cartridge which was recovered on the curb near
Jackson's feet.  (R.W. 49,50)  Stocker concluded that the gunman
had ejected the live cartridge from the gun and had left the
cartridge at the shooting scene.  (R.W. 50)

Stipulations were entered that a proper chain of custody of
the recovered bullets and cartridge casings was maintained at
all times, and that Beth Patty, a forensic scientist employed by
the Illinois State Police Crime Laboratory, examined the
ballistic materials.  (R.W. 79)  Ms. Patty found the recovered
bullets which were basically intact and suitable for microscopic
identification had all been fired by the same firearm.  (R.W.
79,80)  Similarly, the two fired cartridge cases and the unfired
cartridge had been chambered in the same firearm.  (R.W. 80)

Detective David Golubiak testified that in the course of
his investigation of the September 11, 1998 murder of Jaha
Jackson he (Golubiak) initiated a search for the defendant,
Patrick Turner.  He obtained an arrest warrant for Turner.
(R.W. 62)

Golubiak related that he had interviewed Demetria Keyes on
the evening of the shooting.  (R.W.  66,67)  The interview took

6

11

place in Ms. Keyes's home.  (R.W. 66-69)  There was a crowd of
people in Ms. Keyes's house, porch, and outside her house.
(R.W. 69-71)  Golubiak described Ms. Keyes's demeanor during the
interview as very apprehensive.  (R.W. 70)  People were watching
her as she spoke to him (Golubiak).  (R.W. 71)  Det. Golubiak
acknowledged that Ms. Keyes told him during the interview that
she had been in her home of the time of the shooting, and that
although she had seen the dice game in progress she had not seen
the shooting.  (R.W. 67,68,75,76)

Detective Golubiak testified that in late April, 1999,
almost seven and a half months after the September 11, 1998
shooting, he (Golubiak) and other officers located and arrested
the defendant at 6551 S. Wentworth.  (R.W. 62,63)  Detective
David Sivicek testified that he (Sivicek) also participated in
the April 27, 1999 arrest of the defendant.  (R.U. 156,157)

Detective Sivicek related that following the defendant's
arrest, he (Sivicek) was present when an Assistant State's
Attorney wrote down an oral statement given by the defendant.
(R.U. 158-161)  In the statement the defendant related that
originally the Gangster Disciples had granted him the exclusive
right to sell drugs on the 6800 block of South Carpenter. (R.V.
6)  Later, other Gangster Disciples began selling drugs on his
block.  (R.V. 6)  On September 11, 1998 the defendant was
playing dice with Jaha Jackson and others.  (R.V. 6)  The
defendant and Jaha Jackson began arguing.  (R.V. 6,7)  The
defendant felt that he had to assert himself and to  show his

7        12

competitors that he was not going to be pushed around.  (R.V.8)
The defendant proceeded to enter his house and to obtain his
.380 caliber handgun.  (R.V. 8)  While he was inside his house
he heard one of his competitors say that he was tired of the
defendant.  (R.V. 8,9)  As the defendant was leaving the house
with his handgun his girlfriend's mother cautioned him not to
start anything outside, but the defendant replied that he was
going to end the dispute that night.  (R.V. 9)

The defendant related in his statement that Jaha Jackson
started poking him (defendant) in his head with his (Jackson's)
hand.  (R.V. 10)  The defendant walked a short distance from
Jackson, then turned and fired at Jackson.  (R.V. 10)  Jackson
did not have a weapon in his hand.  (R.V. 10)  Jaha Jackson
fell.  (R.V. 10)  The defendant then stood over Jaha Jackson and
fired at him four more times.  (R.V. 10)  As the defendant
attempted to fire his sixth shot, the gun jammed.  (R.V. 10)
The defendant ejected the live round and he chambered a seventh
round which he fired at one of Jaha's companions.  (R.V. 11)
The defendant then left the area in a car driven by one of his
(defendant's) friends.  (R.V. 11)  Detective Sivicek relating
that during the statement which the defendant gave to the
Assistant State's Attorney, he (defendant) admitted that during
the incident he (defendant) did not see anyone with a weapon
other than himself.  (R.V. 11)

B.   The Defense's Case

Curtis Jackson testified that on the evening of the shooting he (Jackson) arranged to meet the defendant in order to drive him (defendant) away from the area around his (defendant's) house. (R.W. 89,90) Curtis Jackson testified that the defendant told him that people in the neighborhood were upsetting him. (R.W. 90) Jackson related that when he arrived at the defendant's block on Carpenter he observed the defendant playing dice with Jaha Jackson and others. (R.W. 91) Jackson testified that he noticed that Jaha Jackson was drunk and was angry. (R.W. 93,94,130,131) Jaha threw the dice away and threatened the defendant by making such statements as, "I'll beat your ass." (R.W. 94,95)

Curtis Jackson related that a group of people then congregated in front of the defendant's house. (R.W. 96) Jaha continued to make verbal threats to the defendant, vowing to kill the defendant (R.W. 97) Jaha then pushed the defendant's face with his (Jaha's) fingers. (R.W. 98) At this point the defendant went into his house. (R.W. 99) While was in his house Jaha was saying, "I'll kill that punk. I'm tired of him." (R.W. 100,101)

Curtis Jackson testified that when the defendant came out of his house Jaha continued taunting and threatening the defendant. (R.W. 101,102) Jaha pushed the defendant about 12

9

14

times and Curtis Jackson and he (defendant) walked toward Curtis
Jackson's car. (R.W. 101,102)  Then Jackson saw the defendant
shoot Jaha who was standing close to the defendant. (R.W. 131)
The defendant proceeded to stand over the fallen body of Jaha
and to fire successive shots into Jaha. (R.W. 132,133,135)

Curtis Jackson acknowledged that he did not see Jaha with a
weapon that night. (R.W. 134,135)  He also acknowledged that
the defendant never gave a warning to Jaha before
he (defendant) began shooting Jaha. (R.W. 132,134,135)

Following the shooting Curtis Jackson hurriedly drove the
defendant from the scene. (R.W. 135,136)  But he let the
defendant out of the car a short distance away after refusing
to drive the defendant to the el. (R.W. 136,138-140,148)

Jerline Walls, the defendant's girlfriend and mother of
their child, testified that the defendant was residing with her,
their child, and her (Jerline's) family members at 6829 S.
Carpenter on the date of the shooting. (R.W. 154,155,158,
167)  Ms. Walls testified that on the evening of the shooting
she heard Jaha Jackson arguing with the defendant outside her
house. (R.W. 156)  She testified that she heard Jaha tell
someone to go across the street and to get a gun. (R.W. 156)
But she acknowledged that she did not know whether a gun was
actually obtained. (R.W. 157)

Ms. Walls related that the defendant entered the house and
went into a closet. (R.W. 158)  Shortly after the defendant
left the house, she heard a shot. (R.W. 158)  She looked out

10

of her window and she saw two gun flashes. (R.W. 159) Then she saw the defendant enter a car. (R.W. 159)

Under cross-examination Ms. Walls acknowledged that in the statement which she gave to the authorities on the morning following the shooting there is no mention of Jaha telling someone to get a gun. (R.W. 172,175) She also acknowledged that when she saw the defendant shoot Jaha, she did not see any kind of weapon in Jaha's hands. (R.W. 183) And she acknowledged that she had testified at the Grand Jury proceedings that she observed a gun in the defendant's hands. (R.W. 192-195)

The defendant testified that on the evening of the incident he had been playing dice on the street, about four or five houses down from the house in which he lived with Jerline Walls, their child, and Jerline's family. (R.X. 3-5) An argument over the dice game erupted. (R.X. 9-11) Jaha, who was one of the participants in the game, threw the dice away. (R.X. 9) The defendant walked back to his house. (R.X. 9,10) Jaha and others were trash talking to him (defendant). (R.X. 9-11) He (defendant) entered his house. (R.X. 13) When he was in his house he heard a person nicknamed B.J. say, "Kill that bitch when he come back out here." (R.X. 13) The defendant then went into a closet and got his handgun, a .380 Russian semi-automatic. (R.X. 14,15) He put the gun in his pocket. (R.X. 15) As he was leaving the house Jerline's mother cautioned him not to go out and start something. (R.X. 15) The defendant told her that

11

he would not start anything, but that if anyone started
something he would finish it. (R.X. 15)

The defendant testified that as he proceeded to Manny's
(Curtis Jackson's) car, a group of Gangster Disciples blocked
his gate so that he could not get out. (R.X. 16,17) Manny
seemed reluctant to leave. (R.X. 17) The defendant remarked,
"These niggers ain't no shit. Fuck these niggers." (R.X. 17)
Then a group encircled the defendant. (R.X. 19) B.J. attempted
to pat down the defendant and he (B.J.) told the defendant that
he (B.J.) and the others would pull the gun away from the
defendant and would kill him with it. (R.X. 18) The defendant
testified that at that point he became fearful for his life,
even though he did not see anyone with a gun. (R.X. 19,34) The
defendant related that as he (defendant) turned, Jaha was in his
face and was telling him that he (Jaha) would kill him. (R.X.
18) The defendant then fired twice at Jaha. (R.X. 50,51) Jaha
fell to the ground. (R.X. 53) The defendant, who admitted to
being drunk and having had smoked "weed" the day of the
incident, stated he (defendant) then "blinked out." (R.X. 51)
He related that after he shot Jaha twice his (defendant's) gun
just kept going off as he held the trigger. (R.X. 53,54) Jaha
was getting shot as he (Jaha) was falling. (R.X. 54)

The defendant testified that after he shot Jaha he rode
briefly in Curtis Jackson's car. (R.X. 57) The defendant
subsequently buried his gun and then retrieved it. (R.X. 58,59)
About three weeks after the shooting, he sold the gun. (R.X. 59)

The defendant, who admitted that he had never gone to the

police after the shooting, testified that he was arrested about seven-and-a-half months after the shooting. (R.X. 21,61)  He asserted that while in custody he was interviewed by a woman who stated that she was his lawyer. (R.X. 24)  She told him that although he did not have to give a statement, she advised him to give a statement. (R.X. 24)  The defendant stated that he subsequently learned that the woman attorney was in fact an Assistant State's Attorney. (R.X. 27,28)

The defendant acknowledged that an Assistant State's Attorney named Key obtained a statement from him (R.X. 28,29) But the defendant asserted that he (defendant) had been a special education student and had not gone beyond 8th grade. (R.X. 30)  Consequently, he could not read anything beyond a simple sentence. (R.X. 30,31)  The defendant asserted that he gave Key what he (defendant) believed was a self-defense explanation of the incident. (R.X. 33)  But Key never read the entire statement to him. (R.X. 30)

C.   State's Rebuttal

Rivanda Doss testified that in her capacity as an Assistant State's Attorney, she had occasion to interview Jerline Walls on September 12, 1998. (R.X. 70,71)  Ms. Walls was a witness to the murder of Jaha Jackson. (R.X. 71-73)  Assistant State's Attorney Doss asserted that she identified herself to Ms. Walls as a prosecutor, not her (Walls's) attorney. (R.X. 73)

Ms. Doss testified that she wrote down an oral account

13          18

which Ms. Walls provided to her.   (R.X. 73,74)   She (Doss)
testified that she first had Ms. Walls read out loud a portion
of the statement and then she (Doss) read the remainder of the
statement to Ms. Walls.  (R.X. 74,75)  Any corrections were made
and initialed by Ms. Walls, Ms. Doss, and Detective McCabe (who
was also present for the taking of the statement).  (R.X.
75,76,78)  Ms. Walls signed each and every page of the
statement.  (R.X. 75)

Following Assistant State's Attorney Doss's testimony the
prosecution concluded its rebuttal by entering into a
stipulation.  (R.X. 83)  The stipulation was that the court
reporter who took down Ms. Jerline Walls's testimony at the
Grand Jury proceeding would testify that at no point during her
(Walls's) Grand Jury testimony did Ms. Walls state that she had
heard Jaha Jackson tell someone to get a gun.  (R.X. 83)

During the instructions to the jury, the judge gave a
second degree murder instruction and a self-defense instruction
as well as a first degree murder instruction.  (R.X.
145,147,152,154,155,156-160)  The jury was given the option of
finding the defendant guilty of first degree murder, not guilty
of first degree murder, or guilty of second degree murder.
(R.X. 162)

After a few hours deliberation period, the jury found the
defendant guilty of first degree murder.  (R.X. 166, R.X.X. 5,6)

At the sentencing hearing it was established that in
addition to a juvenile record the 23 year-old defendant had two

14

misdemeanor convictions as an adult.  (R.E.E. 4)  The defendant
acknowledged that what he had done was wrong.  (R.E.E. 8)  The
judge characterized the defendant's act of shooting Jaha Jackson
as "senseless."  (R.E.E. 9)  The judge then sentenced the
defendant a prison term of 25 years.  (R.E.E. 9)

On March 16, 2001 the judge denied the defense's motion to
reduce sentence.  (R.F.F. 1,3; C.L. 64)  The defendant filed a
Notice of Appeal on April 10, 2001.  (C.L. 66)

20

This petition is based on the authority of Anders v. California, 386 U.S. 738, 18 LEd 2d 193 (1967) as permitted by Smith v. Robbins, 528 U.S. 259, 145 L.Ed 2d 756, 120 S.Ct. 746 (2000). Points which might arguably be raised on appeal, however frivolous, are discussed below in order to advise the Court that the record on appeal does not contain any issue which would support an appeal.

### ARGUMENT

### I.

**THE EVIDENCE AT TRIAL WAS SUFFICIENT TO ESTABLISH THE DEFENDANT's GUILTY OF FIRST DEGREE MURDER BEYOND A REASONABLE DOUBLT.**

The jury found the defendant guilty of the first degree murder of Jaha Jackson. (R.X.X. 6) The record supported the jury's verdict.

It is abundantly clear that the defendant shot and killed Jaha Jackson. Samuel Landingham testified that he saw the defendant and Jaha Jackson arguing. (R.U. 115) Landingham then saw the defendant briefly enter his (defendant's) house come back outside, and repeatedly shoot Jaha. (R.U. 116-118) Demetria Keyes gave testimony similar to Landingham's. Although she acknowledged that she had given a different version of the incident to the police immediately following the incident, Ms. Keyes testified at trial that she had observed the argument between the defendant and Jackson. (R.U. 138-140) She related

16

21

at trial that she saw the defendant briefly enter his (defendant's) house and return outside. Ms. Keyes testified that although she only heard but did not see the first shot, she did see the defendant standing over Jaha and firing numerous shots into Jaha's body. (R.U. 142,143)

Dr. Jones, an Assistant Medical Examiner, testified about the numerous bullet wounds which Jaha received. (R.W. 8-12) Dr. Jones concluded that the bullet wounds caused Jaha Jackson's death. (R.W. 15)

Indeed, even the defendant admitted that he had shot Jaha Jackson. In a statement which he made to an Assistant State's Attorney the defendant stated that he had in fact entered his house after arguing with Jaha, obtained his handgun, returned outside, and shot Jaha. (R.V. 6-10) The defendant also acknowledged during his trial testimony that he had shot Jaha. (R.X. 20)

It it also abundantly clear that the defendant had not acted in self-defense. Eyewitness Samuel Landingham testified that he did not observe a weapon in Jaha's hands at the time of the shooting. (R.U. 118) In fact, Landingham stated that he did not see Jaha even touch the defendant before the defendant shot Jaha. (R.U. 118-119) In the defendant's statement he (defendant) acknowledged that he never saw any weapons other than his own during the entire incident. (R.V. 10,11) Defense witness Curtis Jackson testified that he did not see Jaha with a weapon at the time of the shooting. (R.W. 134,135) Curtis Jackson also testified that the defendant never gave any warning

17

22

before he shot Jaha. (R.W. 132) Even the defendant's
girlfriend, Jerline Walls, testified that she did not see a
weapon in Jaha's hands before the defendant shot him. (R.W.
183) And under cross-examination, Ms. Walls admitted that her
statement to an Assistant State's Attorney (Rivanda Doss) made
no mention of Jaha telling someone to get a gun for him. (R.W.
175) Assistant State's Attorney Doss testified and confirmed
the fact that Jerline Walls never told her that she (Walls) had
heard Jaha direct a bystander to get a gun for him. (R.X. 76)

Moreover, prior to the shooting the defendant made no
effort to summon the police, nor did he remain in the relative
safety of his home. Instead, he aggressively confronted Jaha
and cold bloodily shot him. ((R.U. 116,118,140,141; R.V. 8;
R.W. 130-132,177, R.X. 51) Following the shooting the defendant
hurriedly left the scene and buried the murder weapon. (R.X.
57,58) He never went to the police to tell them about his
version of the incident. (R.X. 21) In fact he avoided any
contact with the police until he was located and arrested
approximately seven-and-a-half months after the shooting. (R.X.
61)

Case law holds that "In order to successfully utilize the
affirmative defense of self-defense a defendant must demonstrate
the following: that force has been threatened against him; that
he is not the aggressor; that the danger of harm is imminent;
that the force threatened is unlawful; that he actually believes
a danger exists; that the use of force is necessary to avert the
danger and that the kind and amount of force which he used was

18

necessary; and that the above beliefs are reasonable." People
v. Riggins, 205 Ill App 3d 904,910, 564 N.E. 2d 122 (1st Dist.,
6th Div. 1990)  In the instant case the defendant utterly failed
to successfully establish the affirmative defense of self-
defense.  The existence of self-defense is a question of fact
which is to be determined by the trier of fact.  People v.
Harper, 264 App 3d 318, 322, 636 N.E. 2d 977 (1st Dist., 1st
Div. 1994), appeal denied 161 Ill 2d 533, 649 N.E. 2d 420
(1995)  In Harper, the reviewing court in affirming the
defendant's first degree murder conviction took particular note
of the fact that the defendant left the scene of the
confrontation, obtained a firearm, and returned to the
confrontation scene where he shot and killed the unarmed
defendant.  Harper, 264 Ill App 3d at 322.  Similarly, in the
instant case defendant Turner left the site of the verbal
argument, went into his house, obtained a handgun, returned to
the scene and shot the victim.  (R.U. 116-119,140,141, V.7-10, W
96-102, 156-159,181)

Upon review of the sufficiency of the evidence to support a
conviction, all of the evidence is to be considered in the light
most favorable to the prosecution.  People v. Collins,
106 Ill 2d 237, 261, 478 N.E. 2d 267 (1985)  The inquiry upon
review is whether, after viewing the evidence in the light most
favorable to the State, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable
doubt.  Collins, 106 Ill 21d at 261, 478 N.E. 2d at 277 (1985)

19

2 4

The presumption is that the trier of fact resolved all
testimonial credibility in favor of the State.  People v. White,
209 Ill App 3d 844, 868, 567 N.E. 2d 1368 (5th Dist. 1991)  It
is not the function of the reviewing court to retry the
defendant.  Collins, 106 Ill 2d at 261.  A conviction will not
be set aside unless the evidence is so unsatisfactory as to
create a reasonable doubt of the defendant's guilt.  People v.
Brison, 106 Ill 2d, 342, 360, 478 N.E. 2d 402 (1985)  Therefore,
it does not appear that there are any meritorious issues which
can be raised on appeal in the instant case.

## CONCLUSION

For the above-stated reasons, it is respectfully requested that the Office of the Public Defender be permitted to withdraw as counsel on appeal in this cause.

Respectfully submitted,


**RITA A. FRY**
Public Defender of Cook County
69 W. Washington
Chicago, Illinois 60602
(312) 603-0600

Counsel for Appellant.

**THOMAS F. FINEGAN**
Assistant Public Defender

Of Counsel.

26

THIRD DIVISION
MARCH 20, 2002

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1-01-1504

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 99 CR 12040 |
| PATRICK TURNER, | ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Following a jury trial, defendant Patrick Turner was convicted of first degree murder and sentenced to 25 years in prison. The public defender of Cook County, who represents defendant on appeal, has filed a motion for leave to withdraw as appellate counsel. A brief in support of the motion has been submitted pursuant to Anders v. California, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967), in which counsel concludes that no issues of merit exist warranting argument on appeal. Copies of the brief and motion were sent to defendant and he was advised that he might submit any points in support of his appeal. He has not responded.

We have carefully reviewed the record in this case and the

1-01-1504

aforesaid brief in compliance with the mandate of the <u>Anders</u> decision and find no issues of arguable merit.  Therefore, the motion of the public defender for leave to withdraw as counsel is allowed.

The judgment of the circuit court is affirmed.

Affirmed.

CERDA, J., with WOLFSON, J., and SOUTH, J., concurring.

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| PATRICK TURNER, <br> Petitioner, <br><br> -VS- <br><br> PEOPLE OF THE STATE OF ILLINOIS, <br> Respondent. | ) <br> )   POST CONVICTION PETITION <br> )   DOCKET No._____ <br> ) <br> )   CASE No. 99-CR-12040 <br> ) <br> )   James B. Linn <br> 0   Presiding Judge |

PETITION FOR POST CONVICTION RELIEF

FILED

DEC 0 2 2002

DOROTHY BROWN
CLERK OF CIRCUIT COURT

NOW Comes, the petitioner, namely, Patrick Turner, in
proper person, and respectfully moves this Honorable Court pursuant
to the Illinois Post Conviction Hearing Act, 725 ILCS 5/122-1 et
seq., to invalidate his convictions and sentences as being procured
and imposed in contravention of Petitioner's Constitutional
Rights under the Illinois Constitution and the United States
Constitution. In support thereof, petitioner states as follows:

PROCEDURAL HISTORY

The petitioner was charged with the First Degree Murder of
Jaha Jackson. After a jury trial petitioner was found guilty of
First Degree Murder on September 6, 2000. Petitioner was sentenced to
twenty five (25) years in the Illinois department of Corrections
on March 9, 2001.

On direct appeal appellate counsel filed an Anders Brief, and
was granted leave of the Appellate court to withdraw as counsel
on March 20, 2002. Petitioner therefore has until September 20,
2002, within which to file a Post Conviction petition. This
petition was placed in the hands of the prison officials here at
Stateville Correctional Center, for them to mail. This was done
.n September 19, 2002, and this fact is attested to by the signature
of the Notary Public, and Notice of Filing submitted with this
petition.

9

AFFIDAVIT

I, Chirstopher Canon, being first duly sworn and deposed upon oath under penalties of perjury, hereby states as follows;

1.  I am employed at the Stateville Correctional Center, located at P.O.Box 112, joliet, Illinois 60434, as a Counselor;

2.  I was working in my official capacity on or about the 19th of September, 2002; and on such date I was required to go to my assigned work area known as C-House, in which my caseload is housed;

3.  On September 19th, 2002, legal documents pertaining to an inmates Post Conviction Petition had been given to the ranking Correctional Officer by an inmate on my caseload by thee name of Patrick Turner, registration number R-03191, in order to be notarized and mailed on said date;

4.  Inmate Patrick Turner, registration number R-03191, had informed said ranking Correctional Officer that such legal documents had to be notarized and mailed on that particular day, because the 19th of September, 2002 was in fact his official deadline;

5.  The legal documentation pertained to Patrick Turner's Illinois Post-Conviction Petition, Proof of Service, and filing notification to procedural requirements;

6.  These legal documents were given to me on the 19th of September, 2002, by said ranking Correctional Officer in order to be notarized and mailed;

7.  Patrick Turner could not get said legal documentation notarized himself, due to the implementation of several institutional Lockdowns, which precluded all inmate movements and services(i.e. school, law library, yard, gym, and religious services, visits, and non-emergency activity generally);

8.  As a Counselor, I am the individual who would normally be contacted in relation to matters such as Patrick Turner's situation, which is caused by institutional Lockdowns, or which may occur at a time in which his particular Housing Unit is not scheduled to go to the institutional Law Library and he is unable to comply with Court Orders due to circumstances beyond his immediate control: and

9.  In relation to the situation specified herein, I was simply unable to get Patrick Turner's legal documentation notarized on the 19th of September, 2002;

9A

10.   As a Counselor, I am the individual who would normally be contacted in relation to matters such as Patrick Turner's situation, which is caused by institutional Lockdowns, or which may occur at a time in which his particular Housing Unit is not scheduled to go to the institutional Law Library and he is unable to comply with Court Orders due to circumstances beyond his immediate control; and

11.   In relation to the situation specified herein, I was simply unable to get Patrick Turner's legal documentation notarized on the 19th of September, 2002;

12.   More, affiant sayeth not.

```
"OFFICIAL SEAL"
SHARON CARTER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-8-2003
```

/s/ _____
                Affiant

SWORN and SUBSCRIBED to before me
this 8th day of _November_ , 2002 A.D.

_____
      Notary  Public

9B
18

THAT STATE'S WITNE● DEMITRIA KEYS COMMITTED K●WING AND
INTENTIONAL PERJURY AT PETITIONER'S TRIAL, WHICH WAS SUBORNED
BY THE STATE AND LEAD TO PETITIONER'S CONVICTION. TRIAL COUNSEL
RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT
TO SAID PERJURY DURING TRIAL AND PRESERVE THE PERJURY ISSUE IN
THE POST TRIAL MOTION. APPELLATE COUNSEL WAS ALSO INEFFECTIVE
FOR FAILING TO RAISE THE ISSUE OF PERJURY IN DIRECT APPEAL.
THIS VIOLATED PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT
RIGHTS UNDER THE UNITED STATES CONSTITUTION.

[A].

One of the State's key witnesses against petitioner was
Demitria Keys. She was presented to the jury in this matter as an
occurance witness. Although, it was her testimony that there was
a car between herself and the victim and petitioner, it was also
her testimony that she could see the events that occurred above
the car. That she saw the altercation between petitioner and the
victim until the victim fell to the ground, at which point she
could no longer see the victim, only the conduct of the petitioner
firing a handgun at the victim while standing over him, and the
handgun jamming; then the petitioner unjamming that handgun
several times to continue to fire bullets into the victim. (EX# / )

During this testimony State's witness Keys committed knowing
and intentional perjury in several areas which was suborned by
the State. This perjury will be proved by the testimony of another
State's witness Detective David Golubiak. Illinois law allows a
petitioner in a Post Conviction proceeding to use one State's
witness against another State's witness to establish knowing and
intentional perjury. (EX# 2 )

During petitioner's trial Demitria Keys gave the following
answers during direct examination when being questioned by assistant
State's attorney Morris:  (EX# / )

10

Q. When you came back from the laundromat where did you go?

A. I went in the house, took my laundry in the house, came back outside and sat on the porch.

Q. When you came back out were you sitting with anyone?

A. Yes.

Q. Who were you sitting with?

A. My boyfriend and my kids.

(Further down in the same continuous proceeding on direct )
( examination )

Q. So there were just the two adults and the two babies on the porch?

A. And a couple of my cousins.    (pages 137 and 138 of Exhibit / )

The State suborned perjury from this witness when she gave the above quoted answers to the above quoted questions. Detective David Golubiak testified that he questioned Demitria Keys on the same day as the incident. Under cross examination by defense counsel, he revealed the following about what Ms. Keys told him she saw:  (pages W-67 and W-68 of Exhibit 2 )

Q. And that at 22:45 hours she heard six to seven shots?

A. Yes.

Q.   And that she later saw the victim on to ground?

A.   Yes.

Q.   But she also told you that when she heard the shots she took cover?

A.   Yes.

Q.   And that -- And that everybody was in the house at the time of the shooting where she was?

A.   Yes.

Q.   And from September 11th, since that date has Miss Keyes, Demetria Keyes, contacted you to tell you at ant time that she is now a witness to the shooting?

A.   No.


     It is no doubt that in this matter the State put Ms. Keys on the stand to testify against petitioner that she was an actual witness to the shooting. (Ex# $\mathcal{I}$ ) In fact, she testified that she watched the petitioner stand over the victim and fire bullets into him until the gun jammed. Then watched petitioner unjam the gun and continue to fire. The State in this matter specifically suborned this false evidence where it knew from Detective Golubiak's police report and his live testimony that Ms. Keys told him that everyone was in the house with her at the time of the shooting. (page W-68 of Exhibit $\mathcal{Q}$ ) The State's use of this witnesses testimony in this area contributed to petitioner's conviction. It was intentionally perjured and as such violated petitioner's Fourteenth Amendment right to the United States Constitution.

     It is further clear from this Detectives testimony (page W-68 of Exhibit $\mathcal{Q}$ ) that Ms. Keys didn't see the shooting at all. She was in her house and took cover when she heard the shots. She later saw the victims body on the ground. (page W-68 of Exhibit $\mathcal{Q}$ )

12

This intentional perjury is further proven by another section
of the Detective's testimony on cross examination by defense
counsel. He stated the following, regarding his interview of Ms.
Keys: (pages W-75 and W-76 of Exhibit 2 )

Q. But on September 11th, all Miss Keyes could tell you is that
she saw the dice game, but she didn't see the shooting; right?

A. That evening that's what she told me.

    Do to the Detective's testimony in this area, State's witness
Ms. Keys committed intentional perjury which was suborned by that
State. The goes beyond inconsistent statement's between one
witness verses another. Detective Golubiak is very clear as to
what she told him that night. There is a strong probability that
but for the State intentionally misleading the jury in this
matter, causing them to believe that Ms. Keys had actually seen
the shooting, the results of the proceeding would have been
different. The State can not show that this testimony did not
effect the delibrations of the jurors. Illinois post conviction
law allows for using one State's witness against another State's
witness to prove perjury. (Ex# 3 ) In people v. Ramey,
The State's key witness against Ramey testified at his trial that
he did not receive a deal in exchange for his teatimony. Ramey
filed a post conviction petition using transcripts from an unrelated
sentencing hearing where the assistant state's attorney who had
previously prosecuted him, became a witness for the state in the
unrelated sentencing hearing. Therein, the the assistant state's
attorney Henry Simmons testified that he would bring the fact
that Campbell testified for the State against Ramey to the attention
of the judge that was going to sentence Campbell. The Appellate
court ruled that there was a deal between the State and Campbell
and excepted Ramey's offer of proof which were trail transcripts
verses sentencing transcripts. But more importantly, the Appellate
court excepted Ramey's method of using one state's witness against
another state's witness to prove perjury. (Ex# 3 )

Furthermore, the law is clear that the relevant portion of a
police report is admissible as substantive evidence if a proper
foundation has been laid. People v. Lawrence, 268 Ill.App.3d 327,
664 N.E.2d 19 (1st Dist. 1994).  In the instant case, Detective
Golubiak testified consistent with his police report after the
proper foundation had been laid. (Ex# 2 page W-69) Therefore
this report can be considered by this court as substantive evidence
regarding the intentional perjury of State's witness Demetria Keys.
Her out of court statements to Detective Golubiak were memorialized
verbatim, and became the contents of his police report dated
September 11, 2000. However, her trial testimony was inconsistent
with what she told the Detective, and the information contained
in his reoprt. The contents of the report is proof that she
committed knowing and intentional perjury at petitioner's trial,
and the State in this matter knew of the contents of this report
before it placed her on the stand against petitioner. Thus, the
State knew or should have known that her trial testimony varied
significantly from what she told the Detective, and what his
report contained.

     Under Illinois law police reports are generally inadmissible
as evidence. People v. Toliver, 246 Ill.App.3d 842, 850, 619
N.E.2d 1259, 1265 (1993). However, with the passage of section
5/115-10.1 (West 1994), which governs the admissibility of prior
inconsistent statements in criminal cases, statements contained
in police reports are admissible provided the proper statutory
foundation is established. People v. Thomas, 220 Ill.App.3d 110,
120, 580 N.E.2d 1353, 1361 (1991); People v. Broadnax, 177 Ill.App.3d
818, 834, 532 N.E.2d 936, 946 (1988).

     In relevant part, section 115-10.1 provides that a prior
inconsistent statement does not constitute inadmissible hearsay
if: the witness's statement is inconsistent with his trial testimony;
the witness is subjected to cross examination concerning the
statement: the statement narrates, describes or explains an event
or condition of which the witness had personal knowledge; the witness
acknowledges under oath during his trial testimony to making the
statement. 725 ILCS 5/115-10.1 (a-c)(West 1994).

[ B ] .       State's witness Ms. Keys committed knowing and inten-
tional perjury in another area. It was regarding whether or not
she saw the the men playing dice just before the shooting. During
petitioner's trial her testimony was that she did not see them
playing dice. However, that testimony is proven perjured when
Detective Golubiak testified that she did in fact tell him that
she saw the men playing dice. Ms. Keys testimony in this area was
as follows during cross examination by defense counsel: (pages U-
146, U-147, and U-152 of Exhibit / )

Q.  And did you see the individuals playing the dice game on the
street?

A.  No, I didn't.

Q.  So it's your testimony you never saw anybody playing dice?

A.  No.

            (Further down in the same continuous testimony)
                    (page U-152 of Exhibit / ))


A.  No. I don't recall telling them what time I came home.

Q.  And that you saw a crowd of ten to fifteen male blacks in a
crowd playing dice?

A.  No, I didn't.

Q.  You did not tell them that?

A.  No, I did not.


     The above answers of Ms. Keys are proven perjured by the
testimony of Detective Golubiak. His testimony was that Ms. Keys
did tell him that she saw men playing dice. This is relevant
because it was part of petitioner's defense that the victim
became very angry and hostle at loosing money in the dice game,

                              15

which lead to petitioner having to defend himself against a mand known to carry a gun an █shoot people without warni█ who had angered him. The State in this matter failed to correct testimony that it knew was false, and allowed the testimony of Ms. Keys in this area to intentionally mislead the jury.   Detective Golubiak testified as follows:  (page W-67 of Exhibit ꝗ )

Q.   And at that time she told you that she came home at approximately 10:20?

A.   Correct.

Q.   And that she observed a crowd playing dice?

A.   Correct.

Q.   And that there were approximately ten to fifteen male blaces in the crowd playing dice?

A.   Yes.

   State's witness Ms. Keys committed knowing and intentional perjury in this area which violated petitioner's Fourteenth Amendment right under the United States Constitution.

   The fundamental unfairness of a conviction obtained through the use of false evidence has long been recognized by the Illinois court's and the Supreme Court as a violation of due process. Giglio v. United States, 405 U.S. 150, 153-54, 31 L.Ed.2d 104, 108, 92 S.Ct. 763, 766 (1972); Napue v. Illinois, 360 U.S. 264, 269, 3 L.Ed.2d 1217, 1221, 79 S.Ct. 1173 1177 (1959); People v. Olinger, 176 Ill.2d 326, 345 (1997); People v. Jimerson, 166 Ill.2d 211, 223 (1995). In the instant case, petitioner further request an Admission of Fact under Supreme Court Rule 216, regarding the knowing and intentional perjury committed by Ms.Keys at petitioner's trial, as outlined in this petition. The State has 28 days to affirm or deny under S.Ct. Rule 216 or this allegation of perjury becomes an admitted fact.

16

[ 2 ] .   The petition⬤ was denied his federally ⬤tected right
to Due Process under the Fourteenth Amendment of the United
States Constitution when the State made improper closing arguments,
when said comments were designed to prejudice the jury. These
inflammatory and erroneous comments were designed to raise the
passion of the jury. The state improperly argued:


A.)  That the defendant was resopnsible for all the wrongs of the
community that is part of Chicago, part of every community that
actually affects everyones life. (trial trans.      )


B.)  By arguing that defense attorney really wanted the jury to
feel sorry for the defendant. (Trial trans.      )


C.)  Arguing that the defendant wanted the jury to believe he did
not know what he ws doing with the gun. (Trial trans.      )


D.)  The petitioner was denied his Fifth, Sixth, and Fourteenth
Amendment rights when the petitioner requested counsel under
Miranda, and Edwards v. Arizona. Where the assistant State's
attorney posed as his counsel and obtained an incriminating
statement from the petitioner. This was prosecutorial misconduct
as well. (Trial trans.      )


E.)  Failing to raise issues 1 and 2, counsel's performance fell
below an objective standard of reasonableness.


     Some of these issues were objected to by trial counsel,
preserved in a motion for new trial, and within the record and
were ripe for Appellate review. Appellate counsel was therefore
ineffective for filing an Anders Brief and not raising these
issues on direct review. If not for appellate counsel's unprofessional
errors on direct review, the results of the proceedings would
have been different.

[ 3 ] .   The petitioner was denied his Federally protected Right
to effective assistance of counsel on Direct appeal where appellate
counsel's performance was Constitutionally defeicent, in violation
of the Sixth and Fourteebth Amendment. Counsel was ineffective on
Direct review where counsel filed an Anders Brief, although the
perjury issue, and other issues raised herein were valids enough
to be raised on direct appeal. His inaction on petitioner's
behalf in effet threw away petitioner's only Constitutionally
protected appeal. Counsel failed to raise numerious meritorious
issues on direct appeal. He failed to raise the following issues:

A.)  The petitioner was denied a fair trial, Due Process, and
his rights under the Confrontation Clause of the Fifth, Sixth,
and Fourteenth Amendment. Where the trial court erred, and manifestly
abused it's descretion, by not allowing defense counsel to call
Nicole Walls as a witness to further impeach Demetria Keys.
(trial trans.      )

B.)  Denying the petitioner's right to a fair jury trial and due
process of law under the Fifth, Sixth, and Fourteenth Amendment
to the United States Constitution by questioning juror Nakayama
at a side bar, over objection, and then informing the jury that
Mr. Nakayama's concerns were not as big a deal as the court
previously thought. (trial trans.      )

C.)  For failing to raise an issue of the insufficient evidence,
and that the State failed to prove petitioner guilty of first
degree murder, where the petitioner acted in self defense, or at
the very most, acted in strong provocation. In violation of the
Fourteenth Amendment to the United States Constitution.

D.)  Failed to raise that when petitioner identified States
Exhibit No. 6 for the record, that he was actually "reading" the
statement. (trial trans.      )

E.)  Trial counsel's failure to challenge the state's position
that there was absolutely no evidence that there was no other
weapon out there except the defendant's. (trial trans.    )

F.)  Failing to raise the knowing and intentional perjury of the
state's witness Ms. Keys, and that the State suborned some of her
perjury.

   Said comments infected the trial with a fundamental unfairness
and denied petitioner Due Process and a fair trial.


   The petitioner prays that this Honorable Court will consider
all issues individually, as well as under ineffective assistance
of trial and appellate counsel for failing to raise these issues.

   Petitioner further prays that this Honorable court appoint
counsel for further consideration of pertitioner's claims of
substantial denial of petitioner's federally protected rights
under the Untied States Constitution.


                              Respectfully Submitted

                              Patrick Turner


   "OFFICIAL SEAL"
    SHARON CARTER
NOTARY PUELIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-8-2003


SUBSCRIBED AND WORN TO BEFORE ME
THIS THE 3rd DAY OF October 2002.

   Sharon Carter

NOTARY PUBLIC.

## AFFIDAVIT

I, Patrick Turner, the affiant, do solemnly swear under the penalty of perjury that all the facts attested to herein are true and correct. I further attest that all the statements in the Petition for Post Conviction Relief are true and correct to the best of my knowledge and belief.

Petitioner further attest that further claims, arguments, and Exhibits are forth coming. The Paralegal who was helping me prepare this Post Conviction Petition here at Stateville Correctional Center has the majority of my legal documents, and I am unable to get to him or the documents at this time. I am boderline illiterate. I do not know or understand the law, and can not read my documents. I am in serious need of his help to prepare this petition.

Petitioner has stated the gist of a claim of substantial violations of his Federally protected Constitutional rights, thereby triggering the Illinois Post Conviction Hearing Act. This is a timely filed Petition. The Illinois Appellate court issued an order granting appellate counsel's Anders Brief on March 20, 2002. Petitioner therefore has Six (6) months from that date to file his Post Conviction Petition. This petition is being placed in the hands of the prison Notary Public for him or her to mail this petition to the circuit court today, September 19, 2002. Under the laws of Illinois a petitioner's petition is considered mailed once it has been placed in the hands of the prison officials where he is incarcerated. In this particular instance that day is today, September 19, 2002. The Notary Public attests to this fact by notarizing this Affidavit and signing his or her name on this document. And has given this petitioner the assurance that he or she will mail this petition for him.

Patrick Turner

*Patrick Turner*

SUBSCRIBED AND SWORN BEFORE ME
THIS THE 3rd DAY OF _October_ 2002.

*Sharon Carter*

NOTARY PUBLIC.

"OFFICIAL SEAL"
SHARON CARTER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-8-2003

20

```
 1

 2                        SAMUEL LANDINGHAM,

 3   called as a witness on behalf of the people of the

 4   state of Illinois, having been first duly sworn, was

 5   examined and testified as follows:

 6

 7                      DIRECT EXAMINATION

 8                             BY

 9                      MS. FORRESTER:

10

11       Q    Sam, can you please tell the ladies and

12   gentlemen your name, spell your name for the court

13   reporter?

14       A    Samuel Landingham, S-A-M-U-E-L,

15   L-A-N-D-I-N-G-H-A-M.

16       Q    Sam, how old are you?

17       A    16.

18       Q    Are you in school right now?

19       A    Yes.

20       Q    I'm going to direct your attention back to

21   September 11 of 1998.  Do you remember where you were

22   living back then?

23       A    Yes.

24       Q    What was your address back then?
```

```
 1        A     7951 South Hermitage.

 2        Q     On the evening of September 11, 1998, were

 3   you in the area of 68th and Carpenter?

 4        A     Yes.

 5        Q     What were you doing there?

 6        A     Just hanging out playing basketball.

 7        Q     You were hanging out playing basketball?

 8        A     Yes.

 9        Q     Did you know any people that lived over

10   there?

11        A     Yes.

12        Q     Who did you know?

13        A     Kid named Shadat Dominguez, Casey, a girl.

14        Q     Do you know anybody by the name of Jaha

15   Jackson?

16        A     Yes.

17        Q     How long had you known him for?

18        A     A long time.  I can't really say.  A long

19   time?

20        Q     Ever since you were a little kid?

21        A     Yes.

22        Q     Do you know a guy named Patrick Turner?

23        A     Yes.

24        Q     Did you know him by that name or another
```

1    name?

2        A    Another.

3        Q    What was the name you knew him by?

4        A    Frosty.

5        Q    I'm going to ask you to look around the

6    courtroom and tell me if you see Frosty or Patrick

7    Turner in the courtroom today?

8        A    Yes.

9        Q    Can you tell me what he's wearing?

10       A    He's wearing a suit and tie?

11       Q    Can you point to him?

12    THE COURT:    Record will reflect he made in court

13    identification of Patrick Turner.

14    BY MS. FORRESTER:

15       Q    Who did you know longer, defendant Patrick

16    Turner or Jaha Jackson?

17       A    Jaha Jackson.

18       Q    Did you have a good relationship with Jaha?

19       A    Yes.

20       Q    Did you have a good relationship with Frosty?

21       A    Not really.

22       Q    Were you enemies, friends, just knew each

23    other?  Describe it for the ladies and gentlemen.

24       A    Just knew him.

1    Q    You had never had any particular problems?

2    A    Yes.  We had altercations.

3    Q    When you say altercations explain to the

4    ladies and gentlemen of the jury what you mean by

5    that?

6    A    He tried to hustle me some time.

7    Q    What do you mean?

8    A    To try to sell a bike or something or

9    anything.  We got in a little altercation like a

10   little tussle and stuff where he wrestled me down one

11   time.

12   Q    How old were you when that happened?

13   A    14.

14   Q    I'm going to direct you specifically to the

15   12th of September, 98 -- excuse me September 11,

16   evening hours.  You had gone over and played some

17   basketball?

18   A    Yes.

19   Q    You went to see Casey?

20   A    Yes.

21   Q    At some point did you notice anyone playing

22   dice out on the sidewalk, further up the street?

23   A    I didn't know at the time, I just seen a

24   bunch of people standing there?

1      Q    But you weren't playing dice with them?

2      A    No.

3      Q    Who were the people you saw standing around?

4      A    B.J. and a couple of more guys and Frosty.

5      Q    Was Jaha Jackson out there?

6      A    Yes.

7      Q    You said B.J.  Do you know B.J.'s real name?

8      A    No.

9      Q    He was just one of the guys hanging out in

10     that area at the time?

11     A    Yes.

12     Q    Did you notice anything after the guys were

13     playing dice?

14     A    Like what?  Something in particular?

15     Q    Well, did anyone start arguing at some point?

16     A    Frosty and Jaha.

17     Q    And what made you notice that?

18     A    They was loud?

19     Q    You could hear them?

20     A    Yes.

21     Q    Where were you when you first heard them

22     arguing?

23     A    I was standing in front of Casey's house.

24     Q    And about how far away was Casey's house from

1    where those guys were yelling at each other?

2         A    Four houses down.

3         Q    Could you hear what they were saying at that

4    point?

5         A    Not in particular.

6         Q    What did you do?

7         A    I walked down and looked.

8         Q    Why did you walk down and look?

9         A    Because I wanted to know what was happening.

10        Q    After you got closer what did you see?

11        A    They was still arguing?

12        Q    When you say they you're talking about

13   defendant and Jaha Jackson?

14        A    Yes.

15        Q    Could you tell what they were arguing about?

16        A    The dice game.

17        Q    Who was saying what if you remember?

18        A    I can't really say in particular because I

19   don't really remember the exact words they was saying.

20        Q    How close were they standing to each other,

21   Frosty and Jaha?

22        A    I don't really know.

23        Q    Well, as close as you and I are right now?

24        A    No.

1    Q    Closer?  I'm going to walk to you.  When I'm

2    about the same area they were standing as they were

3    arguing tell me to stop.  Closer?

4    A    Yes.  Well, naw, they wasn't that close.

5    About the distance when you was standing in front of

6    the desk.

7    Q    At the end of this table?

8    A    Yes.

9    THE COURT:  Indicating about four or five feet.

10   BY MS. FORRESTER:

11   Q    About how long did they argue?

12   A    It happened quick.  I'm not sure.

13   Q    At some point did either of them leave the

14   area where they were arguing?

15   A    Yes.

16   Q    Who left?

17   A    Frosty.

18   Q    Where did Frosty go?  Did you see?

19   A    In his home.

20   Q    You say his home.  Who actually lived at that

21   house?

22   A    I wasn't sure.

23   Q    Does Frosty have a girlfriend or did he back

24   then?

```
 1        A    I believe so.

 2        Q·   About how long was Frosty in the house?

 3        A    A good five minutes, ten minutes.

 4        Q    Did you see Frosty again after he left from

 5   the argument with Jaha?

 6        A    Yes.

 7        Q    Where did you see him?

 8        A    Standing in front of his house?

 9        Q    Was Jaha in the same place that he was when

10   they were arguing originally or had he moved somewhere

11   else?

12        A    He was standing in front of Frosty's house.

13        Q    When Frosty came back out did you notice

14   anything when he came back down?

15        A    He had a jacket on.

16        Q    Where were his hands?

17        A    In his pocket.

18        Q    What did you see happen next?

19        A    I didn't see what happened next, what I seen

20   the shooting, but as far as when they was arguing they

21   was just arguing, talking back and forth in front of

22   the gate and I was talking to someone else.  They was

23   asking me what's going on.

24        Q    Okay.  Let's back up a little bit, Sam.  You
```

1    said that Jaha left, was gone a few minutes then came

2    back down, is that right?

3        A    No.

4        Q    Excuse me.  Frosty came back down?

5        A    Yes.

6        Q    When he came back down he had his hands in

7    his pockets?

8        A    Yes.

9        Q    At that point did you continue to watch them

10   or were you talking to someone else?

11       A    I was back and forth, trying to see what was

12   happening.  I was talking to someone else?

13       Q    So what was the next thing that you saw

14   Frosty do?

15       A    Fire a gun.

16       Q    And who did he fire the gun at?

17       A    Jaha.

18       Q    Did Jaha have a weapon in his hand at that

19   time?

20       A    No.  He just had a key and a piece of paper

21   but that wasn't in his hand.

22       Q    Now, at any point before -- withdraw that.

23   Did you see Jaha touch Frosty before Frosty shot him?

24       A    During the argument or during the dice game?

1       Q     During the argument.

2       A     No.

3       Q     Again how far away was Frosty from Jaha when

4    he shot him?

5       A     About five feet, four feet.

6       Q     Same place as when I was standing up to you?

7       A     Yes.

8       Q     How many times did Frosty fire the gun when

9    you first looked and saw him shooting at Jaha?

10      A     It was like twice cause it was a pause in

11   between.

12      Q     Were you still watching when there was a

13   pause?

14      A     Yes.

15      Q     Did you see where Jaha went after Frosty

16   pointed the gun and shot it at him.

17      A     Probably toward the fence but I was moving

18   further toward the other direction.

19      Q     You were getting away from where defendant

20   was shooting?

21      A     Yes.

22      Q     But you could still see what was happening?

23      A     Yes.

24      Q     After Jaha fell to the ground what did the

1    defendant do with the gun?

2        A    He went back in the house and then left in a

3    vehicle with somebody.

4        Q    Did you see Frosty go over to the victim

5    after he fell to the ground?

6        A    The victim fell to the ground.  He was

7    standing there, he said, he made a few words -- said a

8    few words and went in the house.

9        Q    So Frosty said words to Jaha as he was laying

10   on the ground after he had been shot?

11       A    Yes.

12       Q    Do you know how many times he shot total?

13       A    It was total about five or six or seven,

14   something like that?

15       Q    So were you able to see Frosty fire the

16   weapon after Jaha fell to the ground?

17       A    I'm not sure.  I remember the firing.  It

18   just happened.  It was kind of --

19       Q    You were moving away when he started shooting

20   at him?

21       A    Yes.  When I realized he shot him, yes.

22       Q    Okay.  What did you do after you saw Frosty

23   go back up into the house?

24       A    I was moving away and I had moved so far up

1    the street I stood to see what was going on.  I had

2    moved back toward Casey's house to see what was

3    happening.

4         Q    You stayed there until the ambulance arrived,

5    is that right?

6         A    Yes.  I was out there the whole time?

7         Q    The police came there and talked to you that

8    night as well?

9         A    Yes.

10        MS. FORRESTER:  For the record I'm showing defense

11   counsel what I've marked as People's Exhibit 3, 4 and

12   5.  May I approach the witness?

13        THE COURT:  Yes.

14   BY MS. FORRESTER:

15        Q    Sam, I'm showing you a picture.  Do you

16   recognize what's shown in People's Exhibit Number 3?

17        A    Yes.

18        Q    What does that show?

19        A    The front of Frosty's house and a car.

20        Q    And does it show a blanket over a body where

21   there's blood?

22        A    Yes.

23        Q    Does this picture show where the defendant

24   was standing when he fired the gun at Jaha?

1      A     Yes.

2      Q     I'm going to ask you to take my pen and place

3   an X where the defendant was standing when he fired

4   the gun when you saw him.

5            For the record witness has marked People's

6   Number 3.

7            Showing you another photograph which I marked

8   as People's Exhibit Number 4, do you recognize what is

9   shown in that photograph?

10     A     Yes.

11     Q     What's shown here?

12     A     Jaha with a sheet over him.

13     Q     So that's Jaha.  He's been shot?

14     A     Yes.

15     Q     Does this photograph show where Jaha was when

16  he was standing right before the defendant shot him?

17     A     Yes.

18     Q     I'm going to ask you to take this pen and

19  circle the area where Jaha was standing before

20  defendant shot him.

21           Indicating the witness has marked the

22  photograph marked People's Exhibit 4.

23           Does this photograph show any other people

24  you recognize?

1      A    Myself.

2      Q    That's you?

3      A    Yes.

4      Q    I'm going to ask you to take this pen and

5  mark where you appear.

6            Indicating for the record he placed a circle

7  on the left side of the photograph.

8            You were out there when the police officers

9  were taking the photos?

10     A    Yes.

11     Q    Were there a lot of people out there?

12     A    Yes.

13     Q    Finally showing you what's marked as People's

14  Exhibit Number 5, for identification, do you recognize

15  what's shown in this photograph.

16     A    Yes.

17     Q    Is this a different angle of People's Exhibit

18  Number 4? That is where Jaha's body is and the front

19  of the house?

20     A    Yes.

21     Q    As to each of those photographs -- by the

22  way, are you shown in this photograph as well?

23     A    Yes.

24     Q    I'm going to ask you to place a circle around

1    where you appear in this photograph.

2            Indicating for the record the witness has

3    marked People's Exhibit Number 5, circled the

4    individual which he has identified as himself by a

5    streetlight.

6            Do each of these photographs, People's 3, 4

7    and 5, truly and accurately show how this area at 68th

8    and Carpenter looked on the evening of September 11,

9    1998?

10        A    Yes.

11        Q    Sam, you indicated that you saw the

12    defendant, who you called Frosty, go into a house

13    after he was arguing with Jaha.  Do you remember that?

14        A    Yes.

15        Q    Does this photograph show the house that he

16    went into?

17        A    No.

18        Q    Do you recognize where Jaha is?  So a corner

19    of the house is shown in this photograph?

20        A    Uh-huh.

21        MS. FORRESTER:  Thank you very much.

22            Judge, I have nothing further.

23        THE COURT:  Defense may cross examine.

24            Ms. Woodbury.

1

2                              CROSS EXAMINATION

3                                    BY

4                              MS. WOODBURY:

5

6        Q     Sam, on September 11 of 1998 you were 14

7    years old at that time, right?

8        A     Yes.

9        Q     And you were in the 8th grade?

10       A     Yes.

11       Q     What school were you going to?

12       A     Scott Joplin.

13       Q     Previously when the state's attorney was

14   asking you questions she was asking you when you were

15   old -- what you did on September 11, 1998, and you

16   said you were going over to your friend Casey's house.

17       A     Yes.

18       Q     Where did Casey live then?

19       A     I'm not sure of the exact house but I can

20   give you -- tell you what it looks like and identify

21   it.

22       Q     How far away was Casey's house from the house

23   where you saw the dice game?

24       A     It was almost a whole -- no, it was about a

U-125

1    good -- from where the dice game was a good five, six,

2    seven houses over.

3        Q    Was it on the same side of the street or on

4    the other side of the street?

5        A    The same side.

6        Q    Before you went to Casey's house you said you

7    were hanging out playing basketball?

8        A    Yes.

9        Q    Where were you playing basketball?

10       A    In the alley on a crate?

11       Q    Was that at Casey's house or somebody else's

12   house.

13       A    It was in the alley.

14       Q    How many houses away was the alley from the

15   dice game?

16       A    It was directly across the street.  Like it

17   was a field right there and a fence and it was a alley

18   right there and a crate.

19       Q    Okay.  And the dice game, when you saw this

20   dice game how many people did you see in the group?

21       A    About four or five.

22       Q    And could you tell from where you were

23   standing whether everyone was playing or were there

24   people just watching too?

1          A     It was people just watching and people just

2     playing?

3          Q     And the people who were playing, how could

4     you tell there were people playing dice?

5          A     Cause they were rolling the dice.

6          Q     You could see that from where you were

7     playing basketball?

8          A     Yes.

9          Q     Could you hear them?

10         A     Yes.

11         Q     Could you hear the conversation, like calls

12    being made on the dice game?

13         A     I just heard people talking around the dice

14    game.  I don't know specifically what they was saying.

15         Q     Were other people standing or some people

16    sitting down or crouching down?

17         A     People crouching down and people standing.

18         Q     Now, the place where you saw people playing

19    dice, how far was that away from where you saw Jaha

20    Jackson when he was shot?

21         A     It was about a couple of houses over.

22         Q     Couple of houses?

23         A     Or a house.

24         Q     Was the dice game on the same side of the

1    street where you saw Jaha shot or on the opposite

2    side?

3         A    The same side.

4         Q    Back on September 11, 1998, did you know

5    Jaha's last name or did you just know him by Jaha?

6         A    I just knew him by Jaha?

7         Q    Did you know B.J. by any other name?

8         A    No.

9         Q    Could you tell whether B.J. was playing dice?

10        A    No.  I don't remember.

11        Q    Were there people standing in the group of

12   people playing dice that you didn't know at all?

13        A    No.

14        Q    Besides B.J. and Frosty and Jaha who else was

15   out there playing dice?

16        A    Another guy, Worm.  And I'm not sure if they

17   was playing but these is the other two guys that was

18   over there, a guy name Stone, Worm and I forgot the

19   other guy's name.

20        Q    And Worm, do you know him by any other name?

21        A    No.

22        Q    How about Stone?

23        A    No.

24        Q    So there was B.J., Frosty, Jaha, Worm, Stone,

1    another guy that you didn't know his name?

2         A    Uh-huh.

3         Q    Previously you just testified at one point

4    you could hear them arguing and they were arguing

5    loudly?

6         A    Uh-huh.

7         Q    And you couldn't hear what they were saying?

8         A    No.

9         Q    You didn't hear any words, didn't hear any

10   names yelled out?

11        A    No.  I just heard yelling and hollering,

12   arguing back and forth?

13        Q    Was this while you were still playing

14   basketball?

15        A    No.

16        Q    Did you stop playing basketball?

17        A    I had already stopped playing basketball and

18   I was sitting in front of Casey's house.

19        Q    When you heard the arguing by the dice game

20   you were already at Casey's?

21        A    Yes.

22        Q    Were you inside Casey's or outside of

23   Casey's?

24        A    Outside.

1      Q      Who was with you, Sam?

2      A      Casey and a couple of her nieces and nephews.

3      Q      And what were you doing on the porch with

4    Casey and your nieces and nephews?

5      A      We was just sitting and talking there.

6    Everybody was just outside.

7      Q      How many people were on the porch?

8      A      Casey -- just me, Casey, her two nephews and

9    her niece.

10      Q      How old were her two nephews if you know?

11      A      One was about two and the other was like four

12    or five.

13      Q      And her niece.

14      A      I'm not sure of her age.  She was young too,

15    she was about the same age.

16      Q      Same age, like under six?

17      A      Yes, like under six.

18      Q      Now, while you were on the porch did you

19    notice when the dice game ended?

20      A      Yes.

21      Q      And were you still on the porch -- how did

22    you know the dice game ended?

23      A      Cause everybody was walking toward Frosty

24    house when he walked in his yard.

1      Q      When you say everybody, Sam, how many people

2    were walking toward Frosty's house.

3      A      B.J., Stone and Worm and then the kids across

4    the street started to walk over too to see who was

5    fixing to fight.

6      Q      And you saw Frosty go into the house?

7      A      Yes.

8      Q      Previously you testified that you saw Frosty

9    come out of the house and saw he had his hands in his

10   pockets, is that correct?

11     A      Yes.

12     Q      You said the talking and arguing started

13   again.  Where was Jaha when the argument was going on?

14     A      He was standing on the sidewalk.

15     Q      Okay.  And where was Frosty?

16     A      He was standing inside his gate.

17     Q      When you say inside the gate, inside the gate

18   of the house he came out of, is that correct?

19     A      Yes.

20     Q      Could you hear the words that were going back

21   and forth?

22     A      Yes.  I heard them still down there talking

23   loud but I don't know what they was saying.

24     Q      But you could hear them talking loud.  How

1    many people were talking loud?

2         (A)    It was B.J., Jaha and Frosty.

3         (Q)    And did you ever see B.J. go up and touch

4    Frosty?

5         (A)    Yes.   When they was trying to -- I'm not sure

6    if he touched them but he was standing in between the

7    two of them.

8         Q    When you say standing in between, if I'm

9    Frosty and that's Jaha do you mean in between here?

10        (A)    Yes.

11        (Q)    Did you ever see B.J. go behind Frosty?

12        (A)    No.   He went behind Jaha.

13        Q    B.J. went behind Jaha?

14        A    Yes.

15        Q    And where was Stone and Worm?

16        A    They was standing on the curb.

17        Q    On the curb in front of the gate?

18        A    Yes.

19        Q    Previously you said you knew Jaha for a long

20   time.  How long did you know Worm?

21        A    I knew him for a long time too.

22        Q    And Stone?

23        A    I didn't know him that long, about a few

24   months.

```
 1        Q    Now, Sam, you were there when the police

 2   arrived at the scene?

 3        A    Yes.

 4        Q    And the ambulance came?

 5        A    Yes.

 6        Q    And on September 12, 1998, you spoke to the

 7   detectives investigating this, is that correct?

 8        A    Yes.

 9        Q    And when they were speaking to you was there

10   also a state's attorney present?

11        A    I'm not sure.

12        Q    Did a state's attorney interview you

13   concerning what you saw on September 11, 1998?

14        A    Yes.

15        Q    On that date, Sam, you could read, isn't that

16   correct?

17        A    Yes.

18        Q    Did the state's attorney write out something

19   and ask you to sign it?

20        A    Yes.

21        Q    And did she also ask you to read it to

22   demonstrate that you were able to read?

23        A    Yes.

24        Q    And did she also ask you how old you were,
```

1    where you went to school, what grade you were in?

2        A    Yes.

3        MS. WOODBURY:  No further questions.

4        THE COURT:  Redirect examination?

5        MS. FORRESTER:  No, Judge.

6        THE COURT:  Thank you sir.  You're done.

7                        (Witness excused)

8        THE COURT:  Government may call your next witness.

9                        (Witness Sworn)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1
2                          DEMITRIA KEYES,

3      called as a witness on behalf of the people of the

4      state of Illinois, having been first duly sworn, was

5      examined and testified as follows:

6

7                          DIRECT EXAMINATION

8                          BY

9                          MS. MORRIS:

10

11         Q    Ma'am, could you please state your name to

12     the ladies and gentlemen of the jury.

13         A    My name is Demitria Keys, D-E-M-I-T-R-I-A,

14     Keys, K-E-Y-E-S.

15         Q    How old are you, ma'am?

16         A    23.

17         Q    Do you know Patrick Turner?

18         A    Just from seeing him.

19         Q    Do you see him in the courtroom today?

20         A    Yes.

21         Q    Would you identify him?

22         A    That's him sitting in the tan suit.

23         THE COURT:  Record will reflect she made in court

24     identification of defendant, Patrick Turner.
```

1

2    BY MS. MORRIS:

3         Q    Do you also know Jaha Jackson?

4         A    Yes.

5         Q    How long had you known Jaha Jackson?

6         A    Maybe a year and a half, two years.

7         Q    You know defendant by seeing him in the

8    neighborhood.  Did he live in that neighborhood or

9    stay in that neighborhood from time to time?

10        A    Yes.

11        Q    You would see him in that neighborhood?

12        A    Yes.

13        Q    Where were you living September 11, 1998?

14        A    68th and Carpenter?

15        Q    How long had you lived in that block?

16        A    Two years.

17        Q    Ma'am, I'm going to ask you some questions

18   about the evening of September 11 of 1998.  Do you

19   recall that evening?

20        A    Yes.

21        Q    What had you done that evening?

22        A    I went to the laundromat that evening?

23        Q    At some point did you come back from the

24   laundromat?

1      A    Yes, I did.

2      Q    About what time was it?

3      A    Maybe 10, around 10:00 o'clock.

4      Q    At night?

5      A    Yes.

6      Q    When you came back from the laundromat where

7   did you go?

8      A    I went in the house, took my laundry in the

9   house, came back outside and sat on the porch.

10      Q    When you came back out were you sitting with

11   anyone?

12      A    Yes.

13      Q    Who were you sitting with?

14      A    My boyfriend and my kids?

15      Q    What your boyfriend's name?

16      A    Robert Collins.

17      Q    How many children do you have?

18      A    I have two children.

19      Q    On September 11 of 1998 how old were your two

20   children?

21      A    My son was two and my daughter was seven

22   months.

23      Q    So there were just the two adults and the two

24   babies on the porch?

1          A     And a couple of my cousins.

2          Q     Your cousins, what are their names?

3          A     Champagne Keyes, Shavon Jenkins, Kinesha

4     Jenkins?

5          Q     Champagne, Shavon and Kinesha, how old were

6     they on September 11, 1998?

7          A     Maybe 11, 12 and 9.

8          Q     Children?

9          A     Yes.

10         Q     As you were sitting on the porch with your

11    boyfriend and family members what happened?

12         A     As I was sitting there Jaha walked up and he

13    was on his way coming inside my gate to talk to me,

14    but as he was coming in he got distracted because

15    Patrick said something to him.  So he turned around

16    and went back outside the gate.  I never got to talk

17    to him.

18         Q     Let me back you up a little bit.  When you

19    first came in with your laundry, put your laundry in

20    the house were there people out on the streets?

21         A     Yes.

22         Q     What was the weather like?

23         A     It was hot outside.

24         Q     And that block -- you said that was about

1    10:00 o'clock at night.  Were there artificial lights

2    on the block?

3        A    Yes.

4        Q    You started to tell us Jaha came into your

5    gate to talk to you but you never got a chance to talk

6    to him.

7        A    No.

8        Q    What happened?

9        A    He went back out and started to argue with

10   Patrick.

11       Q    You referred to him as Patrick.  On September

12   11, 1998, did you know his name to be Patrick?

13       A    No.

14       Q    What did you know him as?

15       A    Frosty.

16       Q    You said Jaha started arguing with the person

17   you called Frosty, we now know as defendant Patrick

18   Turner?

19       A    Uh-huh.

20       Q    What happened next?

21       A    He started to go across the street.

22       Q    You mean Jaha?

23       A    Yes.

24       Q    Okay.

1      A      Started to go across the street to where

2  Patrick was at.

3      Q      Did he get to across the street?

4      A      Yes.

5      Q      Where was Patrick?

6      A      He was standing on his steps to his house.

7      Q      Now, you were on the porch of your house.    In

8  relation to where Patrick was on the steps of his

9  house where is your house?

10     A      Directly across the street.

11     Q      Jaha went to where Patrick was?

12     A      Right.

13     Q      What happened next?

14     A      They started to argue and Patrick turned and

15  went inside the house.

16     Q      And did he eventually come out of the house?

17     A      Yes, he did.

18     Q      When he came out of the house, he meaning

19  defendant, what happened?

20     A      He came outside the gate and was standing,

21  him and Jaha was standing there on the sidewalk in

22  front of his house arguing.

23     Q      How close were they arguing with each other?

24     A      They were directly in front of each other.

1          Q       About how many feet?

2          A       A couple, just a couple of feet.

3          Q       When they were arguing they were yelling back

4     and forth at each other?

5          A       Yes.

6          Q       Was either one of them touching each other?

7          (A)     No.  I didn't see them touch each other?

8          Q       The people you told us were out enjoying the

9     warm evening, where were they?

10         (A)     It was a car parked there and they were

11    standing around the car that was parked in front of

12    the house?

13         Q       By the way, how long had the defendant been

14    in that house?

15         (A)     Not long.  He went in and came right back

16    out.

17         Q       When he came right back out did he go

18    directly to where Jaha was?

19         A       Yes.  Cause Jaha was already standing on the

20    side of the street.

21         (Q)     After Jaha and the defendant were arguing

22    back and forth what did you see happen?

23         (A)     I was sitting there on the porch and I --

24    next thing I know I heard a gunshot.  I didn't see the

1    gun.

2        Q    Were you able to see where, the area where

3    the gunshot came from?

4        A    Where they were standing.

5        Q    Where Jaha and defendant were standing?

6        A    Uh-huh.

7        Q    You told us you weren't able to see the gun.

8    Why was that?

9        A    The car was parked there.  If he had his hand

10   down I wouldn't have been able to see it from me

11   sitting on the porch and the car parked in front of

12   there.

13       Q    After the gunshot what happened?

14       A    Frosty turned and he started to run away and

15   he turned around and came back.  By this time Jaha had

16   fell to the ground and he stood over him and started

17   to shoot him again.

18       Q    He shot Jaha while he was lying on the

19   ground?

20       A    Yes.

21       Q    How many times did he shoot him?

22       A    That I can remember I heard shots maybe six

23   or seven times.

24       Q    After he stood over him and shot him the

1    additional amounts of times that you told us -- by the

2    way, was he right on him shooting?

3        A    He was right over him.

4        Q    After he was standing over shooting at him

5    what happened next?

6        A    Well, he was standing there and the gun kept

7    jamming so he stood there, unjammed the gun to shoot

8    again?

9        Q    How many times did the gun jam?

10       A    Maybe two or three.

11       Q    And after each time the two or three times

12   the gun jammed the defendant would do what with the

13   gun?

14       A    He would pull it or however you have to do to

15   unjam the gun he would pull it back to shoot.

16       Q    The entire time Jaha was on the ground?

17       A    Yes.

18       Q    After he shot what you say was at least six

19   times what happened?

20       A    At this time I turned and I ran in the house.

21   I went into the back of the house and told my aunt and

22   got on the phone and called Jaha's mother?

23       Q    Was that Mrs. Jackson?

24       A    Yes, it is.

1          Q    After you called Jaha's mother did you go

2     back outside?

3          A    Yes.

4          Q    After you went outside was defendant, the

5     person you know as Frosty that shot the victim, still

6     there?

7          A    No, he was gone.

8          Q    Did you see him any more that evening?

9          A    No.

10         Q    At some point the police came?

11         A    Yes.

12         Q    At some point you spoke with at least one or

13    two police officers.

14         A    Yes.

15         Q    When you talked to those one or two police

16    officers after just seeing the shooting did you tell

17    them everything that you told the jury today?

18         A    No.

19         Q    Why?

20         A    Because at the time I was very upset and I

21    was scared so I didn't say anything.

22         MS. MORRIS:  Judge, may I approach the witness?

23         THE COURT:  Yes.

24    BY MS. MORRIS:

1    Q    Ma'am, showing you what was previously marked

2    People's Exhibit 3, for purposes of identification,

3    that is a photograph.

4    A    Uh-huh.

5    Q    What is it a photograph of?

6    A    Well, actually this is my front porch right

7    there.  That's the house I stayed in.  And this is

8    their yard, the yard he stayed in.

9    Q    Now, when you say the yard he stayed in, who

10    were you referring to when you say he?

11    A    Frosty.

12    Q    In front of your house there is a station

13    wagon?

14    A    That's -- that is my boyfriend's station

15    wagon.  That's the car I was in that night.

16    Q    Now, you had previously told us about a car

17    being out there and you weren't able to see the

18    defendant having a gun.  Is that the car?

19    A    No.  There was I believe a green car.

20    Q    But that view depicted in People's Exhibit

21    Number 3 is a picture of your house as it looks across

22    the street where this happened?

23    A    Exactly.

24    Q    That gate that's right there, whose gate is

1    that?

2        A    That's the gate to the house where Frosty

3    lived.

4        Q    And this picture, People's Exhibit Number 3,

5    it shows your house in relationship to defendant's

6    house?

7        A    Exactly.

8        Q    And truly and accurately shows how it looked

9    on that day?

10       A    Uh-huh.

11       MS. MORRIS:  I have nothing further, Judge.

12           I tender the witness.

13       THE COURT:  Defense may cross examine the witness,

14   Ms. Woodbury.

15

16                    CROSS EXAMINATION

17                    BY

18                    MS. WOODBURY:

19

20       Q    Ms. Keyes, previously I believe you testified

21   you came home from the laundromat approximately 10

22   p.m. on September 11, 1998?

23       A    Yes.

24       Q    And did you see the individuals playing the

1    dice game on the street?

2        (A)    No, I didn't.

3        Q    So it's your testimony you never saw anybody

4    playing dice?

5        (A)    No.

6        Q    And when you came home from the laundromat

7    did you go straight into the house or stay on the

8    porch?

9        A    I went straight into the house.

10        Q    How long was it before you came back out on

11    the porch?

12        (A)    Maybe five or ten minutes or so.

13        Q    Previously you testified that at one point

14    Jaha was coming up into your gate?

15        (A).    Uh-huh.

16        Q    And it appeared to you that he was going to

17    come and talk to you?

18        (A)    Uh-huh.

19        Q    Except you heard Frosty say something.  Could

20    you hear any of these words being exchanged?

21        A    No.  I don't know what they were.

22        Q    And you saw at one point Jaha and Frosty both

23    arguing with each other?

24        A    Yes.

1     Q    And it was a loud argument?

2     A    Yes.  Pretty loud.

3     Q    But you couldn't hear any of the words?

4     A    No.  I was just going to say that if -- I can

5 recall hearing any other words they said.

6     Q    During this argument did you also see a

7 person by the name of Stone?

8     A    Yes, I did.

9     Q    Where was Stone?

10    A    He was standing by the car that was parked

11 across the street.

12    Q    Is this the car that was in between you and

13 where Jaha and Frosty were arguing?

14    A    Yes.

15    Q    And where was -- do you know a person by the

16 name of Worm?

17    A    Yes.

18    Q    Was he out there?

19    A    Yes.

20    Q    Where was he standing?

21    A    They were all standing over there together.

22    Q    And B.J.

23    A    I know him too.

24    Q    During this argument did you see where he was

E X#1

1    standing?

2         A    He was standing there with Stone and Worm.

3         Q    You're saying B.J., Stone and Worm were at

4    the car?

5         A    Yes.  There were a lot of people.

6         Q    Did you ever see B.J. go up and touch Frosty?

7         A    No.

8         Q    Did you ever see B.J. get in between Frosty

9    and Jaha?

10        A    No.

11        Q    Do you know a person by the name of Mannie?

12        A    No.

13        Q    How about Curtis Jackson?

14        A    No.

15        Q    Do you know a person by the name of Sweat?

16        A    No.

17        Q    Or Keith Thomas?

18        A    No.

19        Q    How about Sam Landingham?

20        A    I know Sam.

21        Q    How do you know Sam?

22        A    Just from being outside on the block.

23        Q    Did you see Sam out there during the

24    argument?



1          A     No.  I don't recall seeing him.

2          Q     Did you see him standing by the car or

3     anything?

4          A     No.

5          Q     Ms. Keyes, were you there when the police

6     arrived at the scene after the shooting?

7          A     No, I wasn't.

8          Q     Previously the state's attorney asked you if

9     you talked to the police after the shooting.  When did

10    you talk to the police?

11         A     That was later on after it had happened.

12         Q     Was that on September 11, the same day as the

13    shooting?

14         A     Yes, same day.

15         Q     Was that at the police station?

16         A     No.

17         Q     Where did the conversation take place?

18         A     At my house.

19         Q     Was it a uniformed police officer?

20         A     No.

21         Q     Was it a detective?

22         A     Yes.

23         Q     How many conversations did you have with this

24    detective?

1        A     Just one.

2        Q     How many detectives?

3        A     I believe there were two.

4        Q     And they came to your house to interview you?

5        A     Uh-huh.

6        Q     At that time you told them -- do you remember

7     the name of either one of the detectives?

8        A     No.

9        Q     You told them you heard an argument that was

10    loud, is that correct?

11       A     Uh-huh.

12       Q     And you came to the window?

13       A     No.

14       Q     You didn't tell that to the detective?

15       A     No, I didn't.

16       Q     And then you left the window?

17       A     Uh-huh.

18       Q     And then you heard a gunshot, at least one

19    gunshot?

20    MS. FORRESTER:  Objection.

21            If we may have a brief side bar.

22                        (WHEREUPON, a discussion was

23                        had off the record.)

24    THE COURT:  Objection is sustained.  You may

1    rephrase your question.

2    BY MS. WOODBURY:

3        Q    Ms. Keyes, did you tell a detective on

4    September 11 everybody was in the house at the time of

5    the shooting?

6        (A)    Yes.

7        Q    And did you tell them that you came home at

8    approximately 10:20?

9        (A)    No.  I don't recall telling them what time I

10    came home.

11        Q    And that you saw a crowd of ten to fifteen

12    male Blacks in a crowd playing dice?

13        A    No, I didn't?

14        Q    You did not tell them that?

15        A    No, I did not.

16        (Q)    And at approximately 10:45 that you heard six

17    to seven shots?

18        (A)    No.

19        Q    And that you later saw the victim on the

20    ground?

21        A    No.

22        (Q)    When you spoke to the detectives you were in

23    your house, is that correct?

24        A    That's right.

1          Q     They asked you questions like your name,

2    where you lived, what your phone number was, right?

3          A     They didn't ask me my phone number.  They

4    asked me my name and they asked me did I live where I

5    was at and I told them yes.

6          Q     I'm going to show you what was previously

7    marked as People's Exhibit Number 3.  Is this the

8    photo the state's attorney just showed you?

9          A     Yes.

10         Q     Where were you when you observed what you

11   just testified you observed or heard the shooting?

12         (A)    I was sitting on the stairs.

13         (Q)    That's your porch.  Were you up similar to

14   where the people are sitting in that photograph?

15         (A)    I'm sorry.  I can't see.  Yes.

16          Q    And when you said that there was a car, where

17   was the car parked?

18         (A)    It was parked right here?

19          Q    That was on the side of where Jaha and Frosty

20   were, is that correct?

21         A     Right.

22         Q     And what color was that car?

23         (A)    I believe it was green.

24         Q     Ms. Keyes, you previously testified that when

EX#1

```
 1    you heard the gunshot you couldn't see exactly where
 2    it was from but you heard it.
 3         A    The first gunshot?  Uh-huh.
 4         Q    And you were still on the porch at that
 5    point?
 6        (A)   Yes, I was.
 7         Q    And you didn't run in the house at that
 8    point?
 9        (A)   No.
10         Q    You didn't grab the kids that were on the
11    porch?
12        (A)   My boyfriend grabbed the kids and took them
13    in the house?
14         Q    And you stayed on the porch?
15         A    Yes, for -- yes.
16         Q    The car was parked on the opposite side of
17    the street in front of the gate?
18         A    Right.
19         Q    And that was the reason you couldn't see
20    where the first shot came from, is that right?
21         A    Right.  That's why I didn't see the gun.
22    MS. WOODBURY:  No further questions.
23    THE COURT:  Redirect?
24    MS. FORRESTER:  No, Judge.  Thank you.
```

Ex# /

1      THE COURT:  Ma'am, you're done.

2                            (Witness excused.)

3      THE COURT:  Call your next witness.

4      MS. FORRESTER:  May we approach please?

5      THE COURT:  Yes.

6          We need about a ten minute recess.  We're

7      going to give you a little break.  Go to the jury

8      room.  When you're back in the jury room, Relax for a

9      minute.  Use the washroom if you need to.  Talk to

10     each other but not about this case.  You have not

11     heard all the evidence yet.  Do not talk about this

12     case.  Short recess.

13                            (A brief recess was had)

14     THE COURT:  Everyone may be seated now.  Thank you

15     for your patience, ladies and gentlemen.

16          Just for scheduling purposes, this is going

17     to be the last witness for today.

18                            (Witness sworn )

19     THE COURT:  Government may inquire.

20     MS. FORRESTER:  Thank you, Judge.

21

22

23

24

Ex #2

1          THE COURT:  Miss Woodbury, you may inquire.

2

3                          CROSS EXAMINATION

4                          By: Ms. Woodbury

5

6          Q.   Detective, what date, if you recall, were you

7    assigned this case?

8          A.   11 September , '98.

9          Q.   That was the day of the shooting; is that

10   correct?

11         A.   Correct.

12         Q.   Besides yourself what other detectives were

13   assigned to the case?

14         A.   I recall my partner, John Griffin.

15         Q.   Do you also recall Detective Paulnitszky at

16   that time?

17         A.   Yes.  He came a little later that evening.

18         Q.   And Detective McCadd, M-c-C-A-D-D?

19         A.   Yes.  He assisted us in the police station.

20         Q.   Okay.  As part of your investigation you

21   interviewed people who may or may not be witnesses to

22   the shootings; is that correct?

23         A.   Yes.

24         Q.   And you interviewed a person by the name of

EN#2

1    Sam Landingham; is that correct?

2        A.    Yes, I did.

3        Q.    And a person by the name of Keith Thomas?

4        A.    Yes.

5        Q.    Who also has the nickname Sweat, I believe.

6        A.    I believe so.

7        Q.    A man by the name of Curtis Jackson?

8        A.    Yes.

9        Q.    A man who has the nickname of Manny; is that

10   correct?

11       A.    Yes.

12       Q.    And you interviewed a person by the name of

13   Demetria Keyes; is that correct?

14       A.    Yes.

15       Q.    Where did the interview of Miss Keyes take

16   place?

17       A.    That took place at her residence over on

18   Sangamon, 6800 block.

19       Q.    When you interviewed her she gave you her

20   name, her address, and her phone number; is that

21   correct?

22       A.    Actually I copied the address before I go

23   into the house and a lot of witnesses may not give me

24   any identifiers I get it from other people or from

1    them. Whenever which way I can get them.

2        Q.    Do you recall her giving you her phone

3    number?

4        A.    Specifically, no.

5        Q.    Okay.  The day that you interviewed her was

6    September 11th, 1998; isn't that correct?

7        A.    Yes.

8        Q.    And at that time she told you that she came

9    home at approximately 10:20?

10       A.    Correct.

11       Q.    And that she observed a crowd playing dice?

12       A.    Correct.

13       Q.    And that there were approximately ten to

14   fifteen male blacks in the crowd playing dice?

15       A.    Yes.

16       Q.    And that at 22:45 hours she heard six to

17   seven shots?

18       A.    Yes.

19       Q.    And that she later saw the victim on to

20   ground?

21       A.    Yes.

22       Q.    But she also told you that when she heard the

23   shots she took cover?

24       A.    Yes.

1    Q.   And that -- And that everybody was in the

2    house at the time of the shooting where she was?

3    A.   Yes.

4    Q.   And from September 11th, since that date has

5    Miss Keyes, Demetria Keyes, contacted you to tell you

6    at any time that she is now a witness to the shooting?

7    A.   No.

8    MS. WOODBURY:   One moment.

9    (brief pause)

10   BY MS. WOODBURY:

11   Q.   And when you arrived at the scene of the

12   shooting, Detective, that was at 10:45 in the evening?

13   A.   No.  I was not assigned until about 11:15

14   that evening.

15   Q.   About 11:15.  So when you arrived there were

16   already other police officers there?

17   A.   Yes.

18   Q.   In uniform?

19   A.   Yes.

20   Q.   Were there other detectives there; do you

21   recall?

22   A.   I don't believe so.

23   Q.   When you spoke to Miss Keyes she told you

24   that she heard the shots at approximately 10:45 in the



 1     evening; isn't that correct?

 2         A.   Yes.

 3         Q.   And as part of your investigation in this

 4     case you not only had to take handwritten notes but

 5     you also typed written reports; isn't that correct?

 6         A.   Correct.

 7     MS. WOODBURY:  I have no further questions.

 8     THE COURT:  Any redirect examination?

 9     MS. FORESTER:  Yes, Judge.

10

11                         REDIRECT EXAMINATION

12                         By: Ms. Forester

13

14         Q.   Detective, when you first met Demetria Keyes

15     that was in her home; is that correct?

16         A.   Yes.

17         Q.   This is shortly after the murder had

18     occurred; right?

19         A.   Yes.

20         Q.   How many people were there when you attempted

21     to interview her?

22         A.   There were several people in her house.

23     There were people on the porch, on the street.  There

24     was -- It was crowded.

1          Q.    Did she appear comfortable to have you at her

2    home to talk you to you at that time?

3          A.    No.   She was very apprehensive.

4          Q.    In fact, Detective, in your experience are

5    people forthcoming in situations like this when you're

6    attempting to get information?

7          MS. WOODBURY: Objection.

8          THE COURT:   Sustained.

9    BY MS. FORESTER:

10         Q.    In this particular case were people

11   forthcoming, that is approaching you and offering to

12   help with your investigation?

13         A.    Actually it was the opposite.

14         Q.    What happened?

15         A.    We've had people who were on the scene

16   telling witnesses to leave or run, not to talk to the

17   police.

18              People are very apprehensive because of the

19   situation.   They are -- There are a lot of gang

20   activity on the block and they associate the people on

21   the street as gang members.

22              From my experience people do not want to talk

23   to police very long.

24         MS. WOODBURY:   Objection.

```
 1          THE COURT:  All right.  Sustained.  That's enough

 2     on that.

 3          Any other questions?

 4     BY MS. FORESTER:

 5          Q.   In this particular case when you were

 6     interviewing Miss Keyes there were numerous people

 7     aware of your presence; isn't that correct?

 8          A.   Yes.

 9          Q.   In fact when she was speaking to you there

10     were other individuals standing outside of her home

11     watching you talk to her?

12          A.   Yes.

13          Q.   In your experience and in this particular

14     case, in this neighborhood, that being in the area of

15     68th and Carpenter do you have more success having

16     witnesses tell you the truth --

17          MS. WOODBURY:  Objection.

18     BY MS. FORESTER:

19          Q.   -- in this particular case?

20          MS. WOODBURY: Objection.

21          THE COURT:  Sustained.

22          Jury  will disregard that question.

23          Jury will also disregard comments that the

24     witness made not related to this case but other cases
```

1    in general relating to gang activity.

2            Jury will concentrate on the evidence

3    relating to this case.

4    BY MS. FORESTER:

5        Q.   Just so we are clear, there were witnesses

6    that were told to leave the scene by other individuals

7    on the scene prior to your interviewing them; is that

8    correct?

9        A.   Correct.

10       MS. WOODBURY: Objection; foundation.

11       THE COURT:  He answered the question.

12       MS. FORESTER: Nothing further.

13       THE COURT:  Any other questions on recross

14   examination, Miss Woodbury?

15

16                    RECROSS EXAMINATION

17                    By: Ms. Woodbury

18

19       Q.   Detective, you interviewed a person by the

20   name of Jerline Walls on September 11th, 1998; isn't

21   that correct?

22       A.   Yes.

23       Q.   Who lives in that neighborhood; is that

24   correct?

1      A.   Yes.

2      Q.  And she spoke to you; is that correct?

3      A.   Yes.

4      Q.   And you interviewed Sam Landingham on that

5  evening of September 11th, 1998; is that correct?

6      A.   Not in that neighborhood.

7      Q.  At his home?

8      A.   No.  He was taken into the police station.

9      Q.   But it was on September 11th, 1998?

10     A.   It was that evening, but probably the next

11  morning.

12     Q.   Okay.  And also you interviewed Keith Thomas

13  on the evening of September 11, 1998; isn't that

14  correct?

15     MS. FORESTER:  Objection.

16     THE COURT:  Overruled.

17     THE WITNESS:  He was not -- He -- He was

18  interviewed, well -- far away from the scene.

19  BY MS. WOODBURY:

20     Q.   But it was the same evening; isn't that

21  correct?

22     A.   Correct.

23     Q.   And Curtis Jackson you interviewed that

24  evening; isn't that correct?

1        A.    Yes.    Those last two people were located at a

2    different area and taken into the police station.

3        Q.    And they spoke to you; isn't that correct?

4        A.    Correct.

5        Q.    And you interviewed a person by the name of

6    Charlene Edwards on that evening; is that correct?

7        A.    Correct.

8        Q.    And a person by the name of Regina Walls;

9    isn't that correct?

10       A.    Correct.

11       Q.    And Chandra, C-H-A-N-D-R-A, Joiner; isn't

12   that correct?

13       A.    The name is familiar, but I can't place it

14   right now.

15       Q.    Miss Demetria Keyes, you interviewed that

16   evening on September 11th?

17       A.    Yes.

18       Q.    And a woman by the name of Charlotte Johnson?

19       A.    Yes.    Most of those were in a canvass.

20       Q.    And when you say the canvass, that's when you

21   canvass the neighborhood; is that correct?

22       A.    Yes.

23       Q.    And you knocked on the door and you talked to

24   them?

1        A.    If they open the door; yes.

2        Q.    Okay.  And you also interviewed a person by

3    the name of Johnnie Foster; isn't that correct?

4        A.    I believe that is the father.  I didn't

5    interview him.

6        Q.    That was on the same street; isn't that

7    correct?

8        A.    I don't believe so.

9        Q.    On direct examination I believe you testified

10   that Miss -- you talked to Miss Keyes, she looked

11   nervous, you thought she was nervous?

12       A.    She was very apprehensive.

13       Q.    Did you ever make arrangements for her to

14   come in the station and talk to you or talk to you at

15   a different location?

16       A.    No.  The way -- I get as much information on

17   the scene, and if I need to, if I don't have any

18   information on the offender or circumstances of the

19   incident what I will do is I will recanvass and

20   reinterview all the witnesses to see if they will give

21   me anymore information.

22       Q.    But on September 11th, all Miss Keyes could

23   tell you is that she saw the dice game, but she didn't

24   see the shooting; right?

1    A.    That evening that's what she told me.

2    MS. WOODBURY:  No further questions.

3    THE COURT:  Any re-redirect examination?

4    MS. FORESTER:  Yes, Judge.

5

6                    FURTHER REDIRECT EXAMINATION

7                    By: Ms. Forester

8

9    Q.    With regard to Johnnie Foster, that was the

10   victim's father; is that correct?

11   A.    Correct.

12   Q.    And he spoke to you?

13   A.    I believe he spoke to my partner.  I didn't

14   talk to him in-person.

15   Q.    The other witnesses cited by the defense

16   attorney, that is Keith Thomas, Jerline Walls, Curtis

17   Jackson, Sam Landingham, all those individuals were

18   interviewed away from the crime scene, is that

19   correct, when you took statements from them; is that

20   correct?

21   A.    Yes.

22   Q.    And the witness to which the defense attorney

23   referred to, Chandra Joiner, was never brought down to

24   the station to be interviewed; is that correct?

1    A.    No.

2    Q.    Nor was Miss Keyes; correct?

3    A.    No.

4    Q.    So the statements given by certain

5    individuals were only obtained at the police station

6    with some remoteness to both the time and the scene of

7    the crime; is that correct?

8    A.    Yes.

9    MS. FORESTER:  Nothing further.

10   MS. WOODBURY:  I have no further questions.

11   THE COURT:  Very good, sir.  You're done.

12            Thank you.

13   THE WITNESS: Thank you.

14                    (witness excused)

15   THE COURT:  Any further witnesses or evidence

16   that the government cares to present at this time?

17   MS. FORESTER:  Judge, we do have a stipulation

18   that we would like to present to the jury.

19   THE COURT:  Jury already understands a stipulation

20   as an agreement between the parties about certain

21   facts which both sides agree are true.

22            You may advise the jury of your stipulation.

23   MS. FORESTER:  One moment, Judge.

24                    (brief pause)